MATSUSHITA ELECTRIC CORPORATION OF AMERICA *vs.* SONUS CORPORATION & others.

Middlesex. December 9, 1971. — June 28, 1972.

Present: TAURO, C.J., QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Equity Pleading and Practice*, Jury issues, Judicial discretion, Waiver, Counterclaim. *Equity Jurisdiction*, To reach and apply. *Contract*, What constitutes, Performance and breach. *Sale*, Contract of sale, Delivery, Warranty. *Waiver*. *Damages*, Breach of contract of sale, Breach of warranty, Loss of prospective profits. *Witness*, Expert witness. *Estoppel.*

Discussion of the difference in the scope of appellate review between suits in equity and actions at law. [250–251]
Where it appeared that a plaintiff brought a bill in equity to recover money due it on certain promissory notes signed by one defendant as maker and by the other as guarantor and to reach and apply in payment of the debt certain property owned by the guarantor, that the defendant maker counterclaimed for breach of contract, and that at the start of trial the parties filed a stipulation which eliminated the plaintiff's claims from the issues to be tried, this court observed that, since the filing of the stipulation had eliminated the only equitable issue from the case, the case should have been amended so as to become an action at law in form as well as in fact, in order to narrow the scope of appellate review and lessen the burden on this court; however, because this was the first occasion on which this court had made such observations, it would review the case as though it were properly before it on an equity appeal, but such review was not to be regarded as a precedent. [248–251]
Where it appeared that a plaintiff brought a bill in equity to recover money due it on certain promissory notes signed by one defendant as maker and by the other as guarantor and to reach and apply in payment of the debt certain property owned by the guarantor, that the defendant maker counterclaimed for breach of contract, that that defendant seasonably filed a claim of jury trial on the issue of its alleged indebtedness to the plaintiff, but the plaintiff filed no such claim, that at the start of trial before a jury the parties filed a stipulation which eliminated the plaintiff's claims from the issues

to be tried, that where, after a few days of trial on the counterclaim the defendant maker waived its right to a trial by jury, the judge over the objection of the plaintiff discharged the jury and continued to hear the counterclaim without a jury, there was no error in denial of a motion by the plaintiff for a mistrial; when the plaintiff voluntarily went into equity, it submitted itself to all the incidents of equity practice, including the discretionary power of the judge to deny the plaintiff a trial by jury and hearing of the counterclaim without jury even though it was based upon a purely legal cause of action, and the record did not indicate any prejudice to the plaintiff by reason of the discharge of the jury. [251–253]

Where it appeared in a suit in equity that the defendant developed, manufactured and marketed a sound actuated electric switch, that, following negotiations between the parties for the plaintiff's furnishing of sub-assemblies to be used in the manufacture of the switches, the plaintiff offered to sell to the defendant sub-assemblies and three component parts the defendant needed pending delivery of the sub-assemblies, and that later the defendant sent the plaintiff a written order for the sub-assemblies and parts, after which the plaintiff's parent corporation wrote to the defendant: "Your Orders have been much appreciated," and there were discussions and correspondence between the parties as to details of the matter without any disavowance by the plaintiff of the existence of a contract, the judge was not plainly wrong in concluding that the parties had made a contract of sale. [254–256]

Where it appeared that in a contract for sale of component parts of a device manufactured by the buyer it was specified that the seller was to supply the parts in January, that some parts were delivered in February, some in April, and some in July, that the delay occurred despite repeated communications from the buyer to the seller stressing the urgency of the situation, and that the delay prevented the buyer from filling orders received from customers, a finding that the delay was a breach of the contract by the seller was not plainly wrong. [256–257]

Where it appeared that under a contract for sale of 25,000 sub-assembly units for a device manufactured by the buyer the seller was to ship 3,000 units in each of the months of April, May and June, 4,000 in July, 5,000 in August and 7,000 in September, and that the seller shipped no units in April and no more than 4,608 in May, a finding that the seller failed to make shipments at the agreed rate was not plainly wrong. [257]

Where it appeared that the parties to a contract for sale of certain component parts and sub-assembly units for a device manufactured by the buyer agreed that the buyer would pay for the parts and units within ten days after delivery, that the buyer withheld payment for certain component parts because of delays in delivery of other parts, and that the seller refused to make further deliveries of sub-assemblies unless the buyer made payment before delivery, it was held that in view of the seller's violation of its contract by delays in delivery of certain component parts the buyer was justified in withholding payment for the other parts under G. L. c. 106, § 2-507 (1), that where the seller failed to prove that the buyer was "insolvent" under the tests set forth in

§ 1-201 (23), the seller had no right to refuse delivery in reliance on § 2-705 (1), and that a finding that the seller's refusal to make further deliveries without prior payment was a breach of the contract was not plainly wrong. [257–260]

Where it appeared that in negotiations between the parties to a contract of sale of sub-assemblies to be used by buyer in the manufacture of a sound actuated electric switch a number of sample sub-assemblies furnished by the seller to the buyer included a relay referred to as the "663 relay," that the buyer tested the samples and found them satisfactory, that the buyer ordered from the seller a large number of sub-assemblies "as per . . . sample" and included an order for 663 relays, and that the seller, without the buyer's approval, delivered sub-assemblies with a "LT1-111 relay," which lacked an important feature of the 663·relay and rendered defective many of the buyer's switches, it was held that the seller's substitution of the LT1-111 relay for the contractually required 663 relay constituted a breach of express warranty under G. L. c. 106, § 2-313 (1) (b) and (c), that the buyer's communications and conduct after discovery of the substitution satisfied the requirements of § 2-607 (3) (a), mandating notice within a reasonable time after discovery of a breach or non-conformity with the contract requirements, and that the buyer was not estopped to claim breach of contract by the fact that it had made two prior statements inconsistent with such a claim. [260–262]

Upon a claim for breach of warranty in a sale of components of a device manufactured by the buyer corporation, a finding, based on past earnings records of the buyer and expert testimony by its president, of the amount of the damages for loss of profits due to the breach to which the buyer was entitled under G. L. c. 106, §§ 1-106 (1), 2-714, and 2-715 was not plainly wrong. [262–265]

It was a proper exercise of discretion for the judge at a trial involving the issue of loss of profits by a corporation to exclude opinion testimony as to the sales prospects of the corporation where the witness, although well qualified as an expert professionally, had not familiarized himself with the corporation and its sales prospects and therefore was unable to express any intelligent or helpful opinion. [265]

BILL IN EQUITY filed in the Superior Court on May 23, 1968.

The suit was heard by *Chmielinski,* J.

*George Waldstein* (*Geoffrey D. Wyler* with him) for the plaintiff.

*Jerome Medalie* (*Jeffrey A. Braunstein* with him) for Sonus Corporation.

QUIRICO, J. This is a bill in equity brought by Matsushita Electric Corporation of America (MECA) to (a) recover a sum of money allegedly due it on certain prom-

issory notes signed by Sonus Corporation (Sonus) as maker and by one Scott as guarantor, and (b) reach and apply in payment of this alleged debt certain securities and property owned by Scott. The answer filed by Sonus to the bill included counterclaims hereinafter described. At the start of the trial the parties filed a stipulation which eliminated the claims by MECA from the issues to be tried.[1]

The notes on which MECA sought recovery were given to it by Sonus in payment for component parts and assemblies sold by MECA to Sonus for the latter's use in its manufacture of sound actuated electrical switches. By way of counterclaim Sonus sought damages for MECA's alleged breaches of contract in connection with the sale of this merchandise.[2] After a lengthy trial devoted entirely to the counterclaims, the judge found for Sonus on its counterclaims and awarded it damages and interest in the sum of $234,251.02. The case is before us on MECA's appeal from the final decree, but it has been argued only as to the part awarding these damages to Sonus.

The judge filed a lengthy decision which included findings of facts later adopted by him as his report of material facts under G. L. c. 214, § 23. The evidence consisted of ninety-five exhibits and a 1,429 page transcript

[1] The stipulation provided that except for any claim which may be established by Sonus against MECA, (a) Sonus and Scott owed MECA $33,099.24, plus interest, arising out of delivery of certain merchandise by MECA to Sonus as evidenced by certain notes executed by both Sonus and Scott, and (b) Sonus owed MECA $3,856.24, plus interest, without stating the basis of this indebtedness. The final decree established the indebtedness of Sonus and Scott to MECA in accordance with the stipulation, and dismissed the bill against two corporate defendants. Although MECA claimed a general appeal from the final decree, it has not argued against the provisions of the decree which ordered payment to it by Sonus and Scott pursuant to the stipulation. No evidence was presented at the trial on that part of the bill which sought to reach Scott's securities for application to the debt.

[2] An additional counterclaim by Sonus alleged failure by MECA to comply with certain provisions of the Tariff Act of 1930 and regulations thereunder, with the result that Sonus was deprived of reimbursement for duties paid on merchandise sold to it by MECA. The judge found against Sonus on this claim and it is not involved in this appeal.

of the testimony of witnesses. It is before us under an order of the judge pursuant to G. L. c. 214, § 24.

The case was briefed and argued on both sides as though it were an ordinary equity appeal from a final decree. In this case that is true only in form but not in fact. The only semblance to an equity suit in this entire proceeding was the part of the bill which attempted to reach some securities owned by Scott and to apply them to the debt allegedly due MECA. That vestige of equity disappeared on the opening day of the trial when the plaintiff rested after reading the stipulation of Sonus and Scott as to their indebtedness, and thus presented no evidence in support of its attempt to reach and apply Scott's securities. Stripped of that, we have a claim in contract by MECA against Sonus and Scott on promissory notes, and a claim by Sonus and Scott against MECA for breach of contract, with nothing but money damages sought on either side. But for the purported attempt to reach and apply the securities, these claims would be ordinary actions at law in contract. Treating them as cross-actions in contract, rather than as an equity suit and a counterclaim thereto, there is a considerable difference in the scope of appellate review and in the corresponding burden on this court.

This difference was described quite clearly in *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 143–144, in the following language: "The general and special findings of the judge in an action at law are to stand if warranted in law upon any possible view of the evidence. It is not the function of this court in an action at law to pass upon the weight of the evidence even though reported in full. The only question for us to decide on that phase of the case is whether upon the evidence, with all rational inferences which might be drawn therefrom, the findings can be sustained. The general finding is conclusive if there is any evidence to support it. . . . The rule in equity is different, where on appeal with full report of the evidence it is the duty of this court to decide the case upon its own judgment of the evidence, giving only

due weight to the findings theretofore made, and not reversing them unless plainly wrong except in instances where the evidence is documentary, in which cases this court stands in the place of the trial judge in respect to drawing inferences of fact from the evidence." [3]

When, as here, a case ceases to possess any attributes of a suit in equity, and becomes in fact an action at law, it is appropriate that it be so amended as to form, preferably on motion of a party, but if necessary on the initiative of the court. This is necessary to control the nature and scope of appellate review. Had such an amendment been ordered, the trial judge would not have been required to make his detailed report of material facts, and this court would not now be required to read a transcript of 1,429 pages, much of which does not relate to any issue requiring our decision. Instead, the case would probably be before us on a manageable bill of exceptions, and we would be deciding only questions of law instead of reviewing or making findings of facts. Because this is the first occasion on which we have made these observations, we review the present case as though it were properly before us as an equity appeal. This is not to be regarded as a precedent. *Thorndike, petitioner,* 254 Mass. 256, 257.

Before reaching the principal issues involved in this appeal, we consider MECA's exception to the judge's denial of its motion for a mistrial. Sonus and Scott season-

---

[3] This decision includes the citations of numerous other decisions applying one or the other of the two rules quoted. For some more recent decisions, see: (a) as to actions at law, *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 499; *Matter of Loeb,* 315 Mass. 191, 196; *Casey* v. *Gallagher,* 326 Mass. 746, 748–749; *New York Cent. R.R.* v. *Marinucci Bros. & Co. Inc.* 337 Mass. 469, 470–471; *M. DeMatteo Constr. Co.* v. *Commonwealth,* 338 Mass. 568, 572; and *Heil* v. *McCann,* 360 Mass. 507, 511; and (b) as to suits in equity, *Berman* v. *Coakley,* 257 Mass. 159, 162; *Berry* v. *Kyes,* 304 Mass. 56, 57–58; *Barnum* v. *Fay,* 320 Mass. 177, 180; *Murphy* v. *Hanlon,* 322 Mass. 683, 685; *Hanrihan* v. *Hanrihan,* 342 Mass. 559, 564; *McMahon* v. *Monarch Life Ins. Co.* 345 Mass. 261, 262–263; *Sulmonetti* v. *Hayes,* 347 Mass. 390, 391–392; *Broomfield* v. *Kosow,* 349 Mass. 749, 754; *Younker* v. *Pacelli,* 354 Mass. 738, 741; *Massachusetts Mut. Life Ins. Co.* v. *Massachusetts Life Ins. Co.* 356 Mass. 287, 288; *Save-Mor Supermarkets, Inc.* v. *Skelly Detective Serv. Inc.,* 359 Mass. 221, 223; *Bianchi* v. *Retirement Bd. of Somerville,* 359 Mass. 642, 643–644.

ably filed claims of jury trial on the issue of their alleged indebtedness to MECA. MECA filed no such claim. The trial started before a judge and a jury with MECA's counsel reading the stipulation by which Sonus and Scott admitted liability to MECA while Sonus saved its rights on its counterclaims (see footnote 1 above). MECA then rested and Sonus proceeded to present evidence on its counterclaims. By the fourth day of trial it became apparent that the trial could not be completed in the three days remaining of the term for which the jurors had been drawn to serve. Following a conference between the judge and counsel on this matter, Sonus and Scott filed a written waiver of their right to trial by jury. The judge thereupon told counsel he would discharge the jury and continue to hear the case without a jury. Counsel for MECA moved orally that the jury not be discharged and that a mistrial be declared. MECA argued that the stipulation of the parties "was entered into in part on consideration that . . . [they] were going to go ahead with a jury," and that it would prejudice their case to discharge the jury. The motion was denied and the jury were discharged. MECA again moved for a mistrial and the motion was again denied. There was no error.

MECA had a choice of remedies to enforce its claims, one being by an action at law and the other being by a bill in equity to reach and apply under G. L. c. 214, § 3 (7) and (8). By electing to pursue the latter remedy, MECA "must take it subject to the rules which govern courts of chancery, and can have a trial by jury only at the discretion of the court." *Ross* v. *New England Mut. Ins. Co.* 120 Mass. 113, 117. *McAdams* v. *Milk,* 332 Mass. 364, 366–367. By contrast, Sonus and Scott had not voluntarily selected this remedy, and they could not be compelled to give up their right to a trial by jury on the issue of the indebtedness. Art. 15 of the Declaration of Rights of the Massachusetts Constitution. *Powers* v. *Raymond,* 137 Mass. 483, 485–486. *Merchants' Natl. Bank* v. *Moulton,* 143 Mass. 543, 544–545. *Stockbridge*

v. *Mixer*, 215 Mass. 415, 417–418. See *Cochrane* v. *Forbes*, 265 Mass. 249, 254. Sonus and Scott were entitled to a trial by jury on the limited issue of their indebtedness to MECA, and could waive it without the consent of MECA. *Gouzoulas* v. *F. W. Stock & Sons*, 223 Mass. 537, 538, and cases cited. The filing of counterclaims by Sonus did not restore to MECA the absolute right to trial by jury which it had waived by electing the remedy in equity. In *Gulesian* v. *Newton Trust Co.* 302 Mass. 369, 371, we held in a similar situation that when the plaintiff "voluntarily went into equity, he submitted himself to all the incidents of equity practice, including the hearing without jury of a counterclaim, even one based upon a purely legal cause of action."

Nothing in the record permits a finding of prejudice to MECA by reason of the discharge of the jury. The record shows no abuse of discretion if we were to treat MECA's objection and motions as a request that the court exercise any discretion it had to allow such jury issues. See *Parker* v. *Simpson*, 180 Mass. 334, 355–356. *Shapira* v. *D'Arcy*, 180 Mass. 377, 379.

We now turn to the substantive questions argued on MECA's appeal from the part of the final decree awarding $234,251.02 to Sonus on its counterclaims. Sonus alleges that the merchandise delivered to it by MECA, or a substantial portion of it, (a) was delivered tardily, (b) was faulty and not consistent with the requirements of their contract, (c) departed from agreed specifications and was useless to it, and (d) failed to conform to certain samples and agreed specifications, MECA having expressly warranted that it would conform thereto. Sonus seeks damages by reason of these alleged breaches of contract by MECA.

The judge found in favor of Sonus on substantially all of the disputed factual aspects of its claim. A substantial portion of the evidence on which the judge made his findings consisted of oral testimony. The testimony of MECA's manager who negotiated with Sonus in this matter spans 280 pages of the transcript. The judge

said of this MECA witness: "[U]pon cross-examination his memory and conduct became so vague, contradictory and confusing (particularly with reference to statements which he had made on deposition several months before the trial), that this Court could not credit his statements at the trial with any high degree of credibility." As to most facts found by the judge against MECA, the latter asks us to make a contrary finding on the basis of our reading of the transcript and our examination of the exhibits. No finding of the judge based in part on oral testimony and involving the element of credibility of the witnesses will be reversed by this court unless plainly wrong. We shall not substitute our opinions on credibility of witnesses whom we did not see for that of the trial judge who both saw and heard them. In discussing the several issues on which MECA seeks appellate review, the facts stated are, with minor exceptions, a brief summary of those found by the judge.

## A. FORMATION OF THE CONTRACT.

Starting in 1965 Sonus developed, manufactured and marketed a sound actuated electric switch called "Sonuswitch," which could be used for many purposes, including the turning on and turning off of electric appliances and equipment. The switch was designed so that it would be activated only by sounds of specific types, ranges, frequencies or volumes, including handclaps, whistles or metallic contact. The switch received much free and favorable publicity in the news media, in magazines, and on television broadcasts reaching widespread audiences. It was also widely advertised by prominent retail stores throughout the country.

At first Sonus itself manufactured the Sonuswitch in its own plant. As sales increased it made use of subcontractors for assembly. In early 1966 Sonus started negotiating with MECA for the latter's furnishing of sub-assemblies to be manufactured by its parent corporation in Japan and shipped to this country where Sonus would complete the manufacturing process by inserting

the sub-assemblies and several other needed parts in the ultimate outer case. The negotiations were conducted in part orally and in part by written communications. The principal negotiators were the president of Sonus and the responsible manager of MECA, but other persons on both sides participated at different times. Since no question is raised about the authority of any of the persons to bind their principals, it is not necessary further to identify them.

By December 30, 1966, MECA had offered to sell Sonus specified numbers of sub-assemblies of a particular content identified by sample and specifications, at a price of $8.27 a unit. MECA would require some time, perhaps ninety days, before it could start delivering the sub-assemblies. In that period Sonus would continue to assemble Sonuswitches at its own plant. However, for this purpose Sonus required sufficient quantities of three specific parts to permit it to maintain production until it began receiving the sub-assemblies from MECA. MECA offered to sell and deliver these parts to Sonus for such purpose.

On December 30, 1966, Sonus sent MECA a written purchase order for a specified number of sub-assemblies and for specified numbers of the three component parts it needed pending delivery of the sub-assemblies, all in accordance with MECA's prior offer. This order specified that certain quantities of the interim supply of component parts were to "be supplied immediately (January) in small quantities of approximately 100–400 per week . . . by air until shipment of the completed chassis is ready." On January 7, 1967, MECA's parent corporation wrote Sonus: "Your Orders have been much appreciated," and continued with an inquiry on some details about the part of the order relating to component parts. In January and February, 1967, the parties corresponded further about details of specifications for the parts, with several references by Sonus to its pressing need for the undelivered parts. In early February a Sonus representative and MECA's parent corporation discussed the

availability and delivery of these parts and Sonus was assured "that the parts would go out before the end of the month." At no time did MECA disavow the existence of a contract.

The judge decided that "[t]he events, discussions and correspondence . . . constituted an offer by Sonus, as reflected in its purchase order . . . [of December 30, 1966] and an acceptance . . . by MECA." These findings are not plainly wrong, and they are perhaps more favorable to MECA than they would be if we were to substitute our view for them. The evidence permits, and perhaps requries, a decision that the parties had entered into a binding contract for the parts and sub-assemblies no later than December 30, 1966, when Sonus sent to MECA a purchase order thereby accepting MECA's then outstanding offer. The judge's decision on this issue is consistent with the proper application of the Uniform Commercial Code, added by St. 1957, c. 765, § 1, particularly the following portions thereof: G. L. c. 106, §§ 2-102, 2-105 (1) and (2), 2-202, 2-204, 2-205, 2-206, 2-207, 2-305, and 2-309 (1). See *Shohfi* v. *Rice*, 241 Mass. 211, 212-213.

## B. MECA's Breach of Contract by Late Delivery.

There are two aspects to the Sonus claim of late delivery by MECA. The first relates to the component parts (capacitors, relays and transformers) which Sonus needed to maintain its production of Sonuswitches pending its receipt of sub-assemblies from MECA. We have already quoted from the Sonus purchase order of December 30, 1966, indicating the need for these parts starting in January, 1967. Admittedly, there was some delay as to some parts because of the need for clarification of specifications. The first delivery of capacitors to Sonus occurred in February, 1967, but the transformers were not shipped until April, 1967, and the relays did not arrive until July, 1967. This delay occurred despite repeated letters and calls from Sonus to MECA stressing

the urgency of the situation. It drastically reduced Sonus's production until the first sub-assemblies were received on May 26, 1967. This prevented Sonus from filling orders received from customers for Sonuswitches. The judge held this delay to be a breach of MECA's contract. The finding was not plainly wrong. There is no merit to MECA's claim that Sonus waived the delay. To the contrary, Sonus was as diligent as it could be in attempting to have MECA comply with the contract requirements as to delivery.

The second aspect of alleged late delivery by MECA relates to the sub-assembly units. During negotiations in August, 1966, MECA agreed that deliveries of these units would "start 90 days after the order was placed." On December 30, 1966, Sonus placed a purchase order with MECA for 25,000 of these units. On March 24, 1967, Sonus and MECA signed a document entitled "Confirmation of Order," fixing the following schedule for MECA's shipments of the 25,000 units: 3,000 in each of the months of April, May and June, 4,000 in July, 5,000 in August and 7,000 in September, 1967. MECA shipped none in April. The evidence is conflicting as to whether MECA shipped 1,608 or 4,608 units in May. The cause of the conflict is a disputed claim by MECA that it made a particular shipment of 3,000 units in May. The judge noted the conflict but did not resolve it in his findings. It is not necessary for us to try to resolve it because on either version MECA's shipments through May fell far short of the required 6,000 units. The judge's finding that MECA failed to make shipments at the agreed rate was not plainly wrong. There were further delays by MECA in its shipments, but it is not necessary to state details of those delays for the purpose of this opinion.

C. MECA's Claim of Justification for Late Delivery.

The Sonus purchase order of December 30, 1966, for interim delivery of component parts and ultimate delivery of sub-assembly units concluded: "Releases against

the blanket order will be issued and payment arrangements are to be worked out together with delivery schedule." The "Confirmation of Order," signed by the parties on March 24, 1967, fixing shipment dates and listing the component parts and sub-assembly units which had been ordered, included the provision: "Terms and payment: Net 10 Days." This required Sonus to pay MECA for the parts and units within ten days after they were received.

On May 26, 1967, after Sonus had received its first shipment of 312 sub-assembly units, MECA's parent corporation sent Sonus a cable as follows: "Please pay $39,834.85 for shipment of 4608 pieces of Sonuswitch subassembly and tooling charges and additional air freight. Please confirm your payment date." MECA decided that it would deliver no more sub-assemblies to Sonus until Sonus either opened an irrevocable letter of credit in favor of MECA or provided bank guaranties for payment. Several shipments of the units arriving from Japan were withheld by MECA at the pier while representatives of MECA and Sonus discussed a settlement of this impasse. Other than the 312 units received in May, no units were delivered to Sonus until July 20, 1967, when Sonus gave MECA the notes signed by it and Scott and for which MECA now seeks payment. MECA attempts to justify its apparent breach of its agreement that payments would be "Net 10 Days" on several grounds which we now consider.

On June 1, 1967, MECA sent Sonus a telegram reading in part, "Requesting your immediate payment of $39,834.85 to cover shipments made per invoices as explained in my previous telegram and per our original agreement. Payment was to be made on receipt of your order." This was clearly contrary to the terms of the document signed by both parties on March 24, 1967, providing that net payment was due ten days after delivery.

MECA claims it was justified in withholding delivery of sub-assemblies because Sonus had not paid for some capacitors within ten days after delivery and owed

MECA $1,400 for them. The capacitors were one of the three kinds of component parts (capacitors, transformers and relays) which MECA had agreed to deliver to Sonus pending delivery of sub-assemblies. We have noted above that MECA had violated its contract by delays in deliveries of these component parts. The relays were not received by Sonus until July 24, 1967. To complete its interim assembly of Sonuswitches pending arrival of sub-assemblies, Sonus needed, and had contracted to receive, all three kinds of component parts, but it received only two of them. In view of MECA's violation of its contract in this regard, Sonus was justified in withholding payment for the incomplete delivery. G. L. c. 106, § 2–507 (1). See Morris v. Prefabrication Engr. Co. 160 F. 2d 779, 781 (5th Cir.).

Finally, MECA attempts to justify its refusal to deliver without prior payment by resort to G. L. c. 106, § 2–705 (1), which provides in part as follows: "The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent." Under G. L. c. 106, § 1–201 (23), "A person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law." MECA did not prove the existence of any one of these three tests of insolvency as to Sonus. It is not sufficient that it deemed itself insecure and therefore desired payment before delivery. It had agreed otherwise and had no right to refuse to comply with its agreement.

The judge's finding and conclusion that MECA's refusal to make further deliveries after May 26, 1967, unless Sonus made payment before delivery was a breach of contract by MECA are not plainly wrong. Further derogating from MECA's attempt on May 26, 1967, to require advance payment from Sonus was the fact that the 312 sub-assemblies which it had delivered that day and an additional large number of them which it proposed to deliver contained a latching relay which did

not comply with the contract requirements. This is discussed below.

### D. MECA's Breach of Warranty on Sub-assemblies.

Each sub-assembly unit made by MECA included a "latching relay" (relay) which moved in response to certain sounds and actuated the electric switch. The relay included a small tongue-like part which moved up and down in operating the switch. A number of sample switches constructed by MECA's parent corporation and furnished to Sonus during the negotiations included a relay designated as the "LT1–663X relay," referred to as the "663 relay." Sonus subjected the samples to "fall tests," including shipment of them to Florida and California and return, to determine whether they would withstand rough handling during transportation. They proved completely operable on their return to the Sonus plant.

The Sonus order to MECA on December 30, 1966, was for 25,000 units of "Sonuswitch chassis as per latest print and sample," and it included an order for a quantity of latching relays identified by "part number LT1–663X–B." In February, 1967, a representative of Sonus made further "fall tests" of completed samples containing the 663 relay and they were satisfactory. At that time a question arose about the availability of the 663 relay, but MECA assured Sonus that that had been resolved, and they would be used in the sub-assemblies ordered by Sonus. The confirmation of order signed by the parties on March 24, 1967, also referred to the 663 relay.

The first shipment of 312 sub-assemblies received by Sonus from MECA on May 26, 1967, did not contain the 663 relay. Instead they contained a relay identified by the number LT1–111, which was significantly different from the 663 relay. An important difference was that the LT1–111 had no restraining feature on or around the tongue with the result that rough handling or a

dropping of the switch with the LT1–111 caused the tongue to swing freely to various positions from which it would not serve as intended to activate the switch in response to sound.

Sonus noticed that the 312 sub-assemblies did not include the required 663 relay and that the LT1–111 relay had been used instead. They did not subject the units to "fall tests," but they tested them electrically and found only nine were defective. Sonus used these units and the next shipment of 1,000 units received by it in completing Sonuswitches which were then sent out in small, partial shipments to a large number of its customers.

Starting in June, 1967, Sonus began to receive reports of defects and malfunctions in the switches containing the LT1–111 relay. In late June or early July it conducted a series of fall and shipping tests which disclosed that any fall or rough handling jolted the tongue to positions where it was out of proper alignment, thus rendering the entire switch inoperable in forty to fifty per cent of the units so tested. Of the first 1,206 Sonuswitches shipped by Sonus with the LT1–111 relay, 464 were returned as defective. MECA's substitution of the LT1–111 relay for the contractually required 663 relay constituted a breach of express warranty under G. L. c. 106, § 2–313 (1) (b) and (c). Sonus did not agree to this substitution, and did not waive the contract requirement that the 663 relay be used.

On July 12, 1967, Sonus wrote to MECA's parent corporation about the problem. This and additional correspondence resulted in the latter's development of a bracket which could be installed on the LT1–111 relay to protect the tongue from moving out of alignment. Ultimately Sonus installed these brackets on 9,258 units having the LT1–111 relay instead of the 663 relay. This process cost Sonus $1.11 a unit. Sonus suffered many long delays in receiving these protective brackets from MECA. One shipment of 4,000 brackets was delayed

for a considerable period because it was mislaid by MECA's receiving department in New York. These delays adversely affected Sonus's production and shipment schedule, and particularly deliveries of its products for the Christmas, 1967, season. Sonus had made efforts to have the brackets made in this country but could not arrange early delivery. It then concentrated on obtaining them through MECA. It sent MECA detailed drawings and explanations of the problem and a suggested means for remedying it. Sonus's communications and conduct satisfied the requirements of G. L. c. 106, § 2–607 (3) (a), mandating notice within a reasonable time after discovery of a breach or non-conformity with the contract requirements. There is no merit to MECA's claim that Sonus is estopped from now claiming a breach of contract because in two communications it made statements inconsistent with its claim of breach. Those prior inconsistent statements alone are not sufficient to estop a later claim of breach of contract. See, as to the requirements for an estoppel, *Cleaveland* v. *Malden Sav. Bank,* 291 Mass. 295, 297–298.

### E. Damages Awarded to Sonus Against MECA.

The total damages of $234,251.02 which the judge awarded Sonus against MECA included the following items: (a) $10,276.38 representing the cost to Sonus for labor required to affix corrective brackets on the tongues of the LT1–111 relay, computed at $1.11 a unit on 9,258 units, (b) $2,100 representing the amount paid by Sonus to MECA for relays which the latter failed to deliver in the time required by their contract and which were returned to MECA, (c) $200,000 representing the damages sustained by Sonus by reason of MECA's several breaches of its contract, and (d) $21,900 representing interest on the above items of damage to the date of the final decree. MECA does not contest the first two items of damages listed above, but it does contest the item of $200,000 and its resulting

effect on the item of interest.

In computing the $200,000 item of damages, the judge did not attribute a specific amount of damages to any one of MECA's several breaches of contract. The evidence did not enable or permit him to do so. The computation was based in part on the production, sales and profit experience of Sonus for the period from November, 1965, through June, 1969, and in part on the testimony, including opinions, of the president of Sonus on the anticipated sales of Sonuswitches for the years 1967, 1968 and 1969. The actual sales for those years fell far short of the anticipated sales and the judge attributed this to MECA's breaches of contract. Without setting forth in detail all of the figures and computations, it is enough to say that in reliance on them the judge made computations which he summed up as follows: "Sonus contended that its legitimate damages on this point reached the sum of $600,000, but the Court believes that a reasonable interpretation of the evidence would not support this amount. While the figure of $300,000 did not seem unreasonable, the Court, in the exercise of its judgment, believes that the sum of $200,000 represents the minimum, reasonable injury to Sonus' good will, and so finds." Although the judge referred to "good will," it is obvious from his findings that he arrived at the figure of $200,000 by computing profits lost by Sonus as the result of MECA's breaches of contract. The finding is not plainly wrong.

Under G. L. c. 106, § 2–714, a buyer who has accepted goods and has seasonably given the seller notice of the nonconformity of the goods to the contract (G. L. c. 106, § 2–607 [3]) "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable . . . [including] [i]n a proper case any incidental and consequential damages" under § 2–715. Section 2–715 (2) provides that "[c]onsequential damages resulting from the seller's breach include (a) any loss resulting from general or particular

requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty." Section 1–106 (1) provides in part that "[t]he remedies provided by this chapter [106] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." The official comment to this Code provision includes the following: "The third purpose of subsection (1) is to reject any doctrine that damages must be calcuable with mathematical accuracy. Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more." Comment 1 to § 1–106 of the Uniform Commercial Code, 1 U. L. A. (Master Ed.).

Under the applicable provisions of the Code quoted in part above, Sonus as the aggrieved party is entitled to "be put in as good a position as if the other party [MECA] had fully performed." § 1–106 (1). This includes the right to recover for the loss of prospective profits resulting from MECA's breach. "The right to recover prospective damages must in each case be decided on its own facts . . . . In determining the amount of damages to be awarded, mathematical accuracy of proof is not required. . . . The likelihood of prospective profits may be proved by an established earnings record. . . . Expert opinion may be introduced to substantiate the amount of prospective profits." *Rombola* v. *Cosindas,* 351 Mass. 382, 385, and cases cited. In the present case the prospective profits were determined on the basis of a combination of past earnings records and in part on the expert testimony of the president of Sonus. The judge's denial of MECA's motion to strike this testimony was not error. His preliminary decisions on the qualifications of the witness and the weight and credibility of his testimony were not plainly wrong. We do not substitute our judgment thereon. *Winthrop Prod.*

*Corp.* v. *Elroth Co. Inc.* 331 Mass. 83, 85–86. *Agoos Leather Cos. Inc.* v. *American & Foreign Ins. Co.* 342 Mass. 603, 606.

MECA offered an expert witness on the subject of prospective sales of the Sonuswitch after 1966. The judge found that the witness was "unquestionably well qualified technically," and "extremely well qualified academically," but he did not permit the witness to express any opinion on the sales prospects of the Sonuswitch. The reason for this action by the judge was that he decided, as a preliminary matter, that the witness, despite his unquestioned professional qualifications, had failed to familiarize himself with the Sonuswitch and its sales prospects and was thus unable to render any intelligent or helpful opinion on the subject.[4] The judge's exclusion of the witness's opinions in these circumstances was a proper exercise of his discretion.

Even if, after the judge's ruling, MECA could have rehabilitated the witness by furnishing him with the information which the judge found he lacked, or by including the information in a carefully framed hypothetical question (*H. H. Hawkins & Sons Co.* v. *Robie,* 338 Mass. 61, 65, and cases cited), it does not appear that any attempt was made to do so. Although counsel for MECA made a statement which he termed an "offer of proof," he never actually put a hypothetical question to the witness. He did not lay the proper foundation for appellate review on this point. *Lawlor* v. *Wolff,* 180 Mass. 448, 450. *Boisvert* v. *Ward,* 199 Mass. 594, 597. *Mackintosh, petitioner,* 268 Mass. 138, 139.

---

[4] In support of his ruling on this point the judge cited the witness's lack of knowledge of the following facts about Sonuswitch: The full extent of the favorable publicity which it had received; the extent of its display in prominent places in leading retail stores; the extent of newspaper and other advertising it had received; the size and types of packaging in which it came; changes in the packaging; changes in its size, also referred to as miniaturization; its selling price at the time he made his market survey and the several reductions in prices thereafter; the duration of any of the conditions listed above; and the effect which MECA's breaches of contract had on the production and sales of the switch.

### F. CONCLUSION.

The several points argued in MECA's brief which have not been covered above have nevertheless been considered, and they disclose no error. Accordingly, the final decree is affirmed with costs of appeal.

*So ordered.*