1 Mass. App. Ct. 505                                    505

Capitol Beef & Provision Co., Inc. *v.* Somerville Dressed Meat Co.

CAPITOL BEEF & PROVISION CO., INC. *vs.* SOMERVILLE DRESSED MEAT CO.

Suffolk.    March 21, 1973. — October 17, 1973.

Present: ROSE, KEVILLE, & ARMSTRONG, JJ.

*Joint Enterprise. Accounting.*

In a suit in equity for an accounting under an oral contract of joint venture to furnish canned pork and gravy to the United States Government, the trial judge's findings were not plainly wrong in denying charges to the joint venture sought by the plaintiff of interest on loans obtained by the plaintiff, where the scope of a responsibility of the defendant for "financing the deal" was exceedingly vague [507-508], freight costs incurred by the plaintiff in taking advantage of fluctuating prices in the supply market [508-510], and certain penalties imposed by the government which fell within the scope of the plaintiff's exclusive function under the agreement [510-511]; or in denying direct charges against the defendant for an alleged indebtedness due the plaintiff from the defendant under an earlier contract [511-512] and a certain alleged receipt of cash by the defendant [512-513]; or in charging the plaintiff for cash advances from the defendant [513-514].

BILL IN EQUITY filed in the Superior Court on December 15, 1964.

The suit was heard by *Collins, J.*

*Daniel F. Featherston, Jr.,* for the plaintiff.

*Sydney Berkman* (*Carl K. King* with him) for the defendant.

ARMSTRONG, J.    The plaintiff appeals from a final decree which dismissed its bill for an accounting, and determined the plaintiff to be indebted to the defendant on the latter's counterclaim in the amount of $23,705.55. The

appeal is before us on a report of the evidence and a report of material facts.

The case arose from an oral agreement to enter into a joint venture to furnish canned pork and gravy to the United States Department of Agriculture (the government). The defendant Somerville Dressed Meat Co. (Somerville) was to supply the pork to the venture at a guaranteed price of fifty-two cents per pound, retaining any profit and bearing any loss resulting from doing so at that price. Somerville was also responsible for "financing the deal." The meat was to be processed and canned by the plaintiff Capitol Beef & Provision Co., Inc. (Capitol) and by Scott Canning Co. (Scott) a company affiliated with Capitol, at a guaranteed price of five cents per pound of meat combined with gravy and seasoning, retaining any profit thereon and bearing any loss. Scott was then to deliver the canned pork and gravy to the government under a series of contracts entered into by Scott with the government at a price of approximately fifty-six and one-half cents per pound of finished product. Any profit or loss from the sales to the government, after the deduction of Somerville's fifty-two cents per pound for the meat and Capitol's and Scott's five cents per pound for processing and canning, was to be shared equally by Somerville on the one hand and by Capitol and Scott on the other.

The agreement was negotiated by one Lampert, the president and principal stockholder of Somerville, and one Hahn, the president and principal stockholder of both Capitol and Scott. The parties agreed that for the purposes of this case Scott, though a separate corporation and not a party to the suit, would be treated as if it were a division of Capitol, and the trial judge so treated it. The trial judge also found that all relevant dealings between Lampert and Hahn were to be ascribed to their respective corporations.

The only issues before us on this appeal are whether, as contended by Capitol, certain of the findings were "plainly wrong." *Matsushita Elec. Corp. of America* v. *Sonus Corp.* 362 Mass. 246, 250-251 (1972). Capitol challenges six of those findings. Three of them involve expenses incurred by

Capitol and Scott which Capitol maintains should have been charged to the joint venture and thus borne in part by Somerville, but which the trial judge refused so to charge. The other three findings challenged by Capitol relate to direct charges between the parties not affecting the profit or loss of the joint venture. Two of these were charges by Capitol against Somerville which the trial judge disallowed, and the third was a charge imposed by the trial judge in favor of Somerville against Capitol. There was no error.

1. The first of the items which Capitol unsuccessfully tried to charge to the joint venture was $3,837.97 in interest on loans which Hahn obtained from City Bank & Trust Co. Capitol bases its contention on Somerville's obligation under their agreement to "financ[e] the deal."

Somerville not only supplied pork for which it was paid only after delivery to and payment by the government, but also made substantial interest-free cash advances to Capitol during the early stages of the venture. It later sought an assignment of the government contracts as security, but learned that Federal regulations prohibited assignments of such contracts other than to a bank. Lampert and Hahn therefore made the following arrangement with City Bank & Trust Co. The contracts were assigned to the bank as security for loans by the bank to Hahn. As payment under each government contract was received, the bank repaid itself therefrom for its then outstanding loans to Hahn, plus interest, and deposited the balance in an account opened in Lampert's name for this purpose. The bank then got Lampert's assent to the release from his account of any excess therein over the amount then owed Somerville by Capitol, and made further advances to Hahn to the extent of the amount so released.

Capitol contends that the interest charged for these loans resulted solely from Somerville's unwillingness to continue its undertaking to finance the venture without interest and without security, that the arrangement with the bank inured entirely to the benefit of Somerville, and that the trial judge was therefore plainly wrong in refusing to charge

any portion — if not all — of the interest expense to Somerville.

We disagree. The trial judge recognized that Somerville benefited from the arrangement with the bank, but was justified in concluding that this benefit was secondary and incidental to that realized by Hahn and Capitol. As one reason for this conclusion, the judge cited his unchallenged findings that none of the loans was made to Lampert or Somerville, that neither of them had any control over or knowledge of the use to which the loans were put, that Hahn was engaged at the time in business activities unrelated to the pork and gravy venture, and that the loans were used by Capitol for its general corporate purposes. The trial judge could have cited other reasons, and perhaps had them in mind when he refused to charge the interest expense to the venture. The evidence is exceedingly vague as to the scope of Somerville's responsibility for "financing the deal." It may have included financing every aspect of Capitol's participation in the venture, or it may have been confined to those aspects which (unlike the canning, for example) were chargeable to the venture as such. The judge was therefore not required to treat the bank arrangement as merely a modification of or delegation of a contractual obligation of Somerville. Moreover, Lampert testified that he had never refused to continue making the advances. While there was evidence to the contrary, the judge was entitled to believe Lampert's testimony to that effect. Finally, there was no evidence of any agreement or understanding that Somerville or the joint venture would bear any part of the interest charges, and Lampert emphatically denied the existence of any such agreement or understanding.

2. The second item which Capitol contends was wrongly omitted as a charge against the joint venture was $4,316.66 in freight charges incurred by Capitol to deliver meat from its processing plant in Boston to Scott's canning facility in Cambridge. Under the original agreement Somerville was to bone the pork and deliver it in such quantities and at such times as Capitol requested to the Scott plant for

1 Mass. App. Ct. 505                                             509

Capitol Beef & Provision Co., Inc. *v.* Somerville Dressed Meat Co.

canning, the cost of delivering it being borne by Somerville as a part of its charge of fifty-two cents for each pound of meat delivered. Later, at Capitol's request, Somerville delivered the pork to Capitol's Boston plant instead, again without additional charge. This meant that the pork had to be transported a second time from the Boston plant to the one in Cambridge, and it is this freight charge which Capitol sought to charge to the joint venture.

This change in the delivery procedure appears to have been caused, at least in part, by the fact that Capitol occasionally purchased pork for the venture from suppliers other than Somerville. It did so on one occasion when a temporary rise in the market price of pork would have caused Somerville to lose money by supplying it at the agreed upon price. Capitol also supplied pork to the venture on a subsequent occasion when the market price had temporarily fallen. On these occasions Capitol, like Somerville, was to supply the meat at fifty-two cents per pound, regardless of its cost to Capitol, and the trial judge credited Capitol at that rate for all the meat it supplied. Some of the meat so purchased had to be boned, and some was frozen and difficult to grind and can to the required weight. Scott had no boning equipment and inadequate grinding equipment at its plant, so these tasks had to be performed at Capitol's Boston plant before the product could be canned by Scott. In order to simplify the canning process in the case of the frozen meat, Capitol would sometimes mix it with fresh meat obtained from Somerville, and this appears to have occasioned at least some of the Somerville deliveries to Capitol rather than to Scott.[1]

Capitol argues that the additional transportation expenses were caused by Somerville's unwillingness to continue supplying the pork at fifty-two cents per pound when the market price rose, and that Capitol should therefore not

---

[1] While the Capitol plant was several miles closer to Somerville's plant than Scott's, there was evidence that this would not have brought about any significant reduction in the delivery costs to Somerville, as the principal cost factor in delivering the meat was loading and unloading it.

be required to bear these freight charges alone. We reject this contention for two reasons. First, the trial judge found, on the basis of evidence before him, that the change in pork suppliers had on both occasions been made at the suggestion of Hahn, and that Somerville had been at all times ready, willing and able to supply the pork at the agreed upon price. Second, we regard the evidence as far from clear that the extra freight charges occurred only when Capitol was obtaining pork from other suppliers because of the increase in its market price — the only occasion when Somerville could have gained any advantage from a change in suppliers.

In concluding that the freight charges were to be borne by Capitol alone, the trial judge was evidently persuaded that the boning and processing performed by Capitol on the meat it supplied, together with the additional transportation required thereby, was comparable to the work performed by Somerville with respect to the meat furnished by it and included in the fifty-two cents per pound charged. We believe this to be a completely reasonable view of the evidence and certainly not "plainly wrong."

3. The third item claimed by Capitol as a proper charge to the joint venture was $9,892.25 in penalties imposed by the government by reason of excess fat in the canned pork and gravy and late deliveries thereof. Capitol argues that the trial judge's refusal to make this charge was plainly wrong for two reasons: first, Somerville was responsible for forcing Capitol to obtain some of the meat from other suppliers and thereby indirectly caused the excess fat and late deliveries for which the penalties were imposed; and second, Somerville must in any event take its partner "warts and all," and share in losses such as these which their joint venture sustains.[2] The first of these arguments is

---

[2] Capitol does not argue that any or all of the meat containing excess fat was supplied by Somerville, and the trial judge's findings as to Somerville's inspection practices, as compared to Capitol's, suggest a greater likelihood that most or all of that meat was obtained elsewhere. Nor does Capitol contest the trial judge's finding that Somerville had always been prompt in its deliveries.

1 Mass. App. Ct. 505                                        511

Capitol Beef & Provision Co., Inc. *v.* Somerville Dressed Meat Co.

sufficiently disposed of in our earlier discussion of responsibility for the introduction of new pork suppliers as bearing on the freight charges. The second is unsound when viewed in the context of the actual agreement between the parties. Under that agreement they were to share equally in profits and losses only after each party had performed certain designated functions — Somerville delivering the boned meat, and Capitol and Scott processing, canning and shipping it — with each party individually realizing any profit and bearing any loss arising from the performance of those individually assigned functions. The trial judge obviously concluded that the penalties fell within the scope of Capitol's and Scott's exclusive functions under the agreement — just as he would presumably have charged the penalties entirely to Somerville had he found that they were caused by Somerville's failure to fulfill its assigned function of furnishing the meat. There was ample evidence to support the trial judge's conclusion.

4. The first of the direct charges against Somerville which Capitol contends was wrongly disallowed arose from an alleged indebtedness of $5,493.57 owed Capitol by Somerville under an earlier contract to supply beef and gravy to the government. The trial judge made findings to the effect that the terms of the beef and gravy venture were in all material respects identical to those of the pork and gravy venture. He also found that of the $5,493.57 claimed by Capitol under the earlier agreement, $4,855.50 was for interest on loans to Capitol, freight charges between Capitol's plant and Scott's, and government penalties for excess fat and late deliveries. He evidently concluded that these were improper charges under the beef and gravy contract for the same reasons that he disallowed them under the pork and gravy agreement. He therefore reduced the sum claimed by those amounts, and allowed Capitol a credit of only $638.07.

We agree with Capitol's contention that there was insufficient evidence to justify the trial judge's detailed findings — or any detailed findings — as to the terms of the beef and gravy contract. We are of the opinion, however,

that Capitol's claim was rightly rejected for a different reason. There was nothing in the pleadings or evidence which we would regard as a concession on Somerville's part that the items in question were owed by it. Capitol had the burden of establishing that the terms of the beef and gravy contract imposed an obligation on Somerville to pay the amounts claimed. *Whelton* v. *Tompson,* 121 Mass. 346 (1876). The very absence of evidence as to what those terms were constituted a failure on Capitol's part to prove its case. As no appeal was taken by Somerville, however, the credit of $638.07 allowed Capitol must stand.

5. Capitol also contends that the trial judge was plainly wrong in disallowing a charge of $20,378.25 against Somerville on account of cash received by Somerville from sources other than the bank. The items from which this amount arises are identified on one of Scott's accounting worksheets as "Agar Packing" in the case of one and as "Gov't - Freight" in the case of the others. We find nothing in the record explaining the source of or reason for these alleged payments. The trial judge treated them as "wash items."

While we question whether there was any basis for the trial judge's characterization, we do not feel that he was plainly wrong in disallowing the items. Capitol had the burden of proving that the sums in question were received by Somerville in its capacity as a party to the joint venture. *Pappathanos* v. *Coakley,* 263 Mass. 401 (1928). The dearth of evidence in this regard makes it equally probable (if not more so) that if Somerville received the alleged $20,378.25 at all, it did so in its capacity as supplier of meat to the venture (perhaps as a refund for prepaid meat orders it cancelled), or in connection with transactions having nothing to do with the pork and gravy venture. Capitol's reliance on the testimony of Somerville's accountant as verifying the validity of this charge against Somerville is misplaced, as we consider his testimony unclear on this point.

A further difficulty with Capitol's contention lies in the fact that the imposition of such a charge against Somerville would require a corresponding credit either to the joint

1 Mass. App. Ct. 505            513

Capitol Beef & Provision Co., Inc. v. Somerville Dressed Meat Co.

venture or to Capital or Scott — in order to identify the creditor to whom Somerville must pay the amount charged. But no such credit is reflected in the profit and loss statement for the venture prepared by Capitol's own accountant, and Capitol concedes in its brief that there is no basis in the record for awarding such a credit to Capitol or Scott. We therefore conclude that Capitol has once again failed to sustain its burden of proof.

6. Finally, Capitol argues that the trial judge was plainly wrong in charging Capitol for cash advances from Somerville in the amount of $233,089.09, in that this amount exceeded what was admittedly owed by $16,000. The $16,000 discrepancy arose from two entries in a Somerville accounting statement which was introduced in evidence: one, an "uncollected exchange check of Capitol Beef" for $15,000; and the other, $1,000 "due from Arnold Hahn for loan."

Capitol contends that Somerville's accountant, who was found by the trial judge to have been the final arbiter of accounts in the joint venture, testified that the correct figure for the advances was only $217,089.09. Capitol also calls attention to the fact that the Somerville accountant segregated the $15,000 and $1,000 items from the items totaling $217,089.09 in his own worksheets as an addendum thereto, and the fact that the accountant expressed ignorance about the reason for the $15,000 item and characterized the $1,000 item as a personal loan to Hahn. Capitol also interprets certain testimony by Lampert as admitting that these items were unrelated to the pork and gravy venture. Capitol argues that these items were therefore not shown to be related to the venture and that the evidence referred to demonstrates that they were unrelated to it.

We are not persuaded that the evidence on which Capitol relies supports either conclusion. The testimony of the accountant as to the amount of the advances was equivocal at best. Nor do we regard the format of the worksheets in which the two items appear as controlling. We interpret Lampert's somewhat confusing testimony about these items as stating that they had nothing to do with the profit

or cost of the venture, not as stating that they were wholly unrelated to the venture. On the contrary, Lampert testified that he would not have made either of these loans if the venture had not been in progress. There was also evidence that the $15,000 item was in the form of an "exchange check" from Somerville to Capitol, and that it was therefore indistinguishable from numerous other cash advances made in connection with the venture to Capitol in that form and in that amount[3] — except for the fact that the check given by Capitol in exchange for this one, unlike the others, failed to clear. The fact that the $1,000 item appears to have been a personal loan to Hahn is not controlling because of the trial judge's finding that the acts of Hahn were to be ascribed to the corporations he headed. The evidence indicates that the loans from City Bank & Trust Co. discussed earlier in this opinion were also made to Hahn personally, but no one suggests that those loans were unrelated to the venture. For these reasons we are of the opinion that the trial judge was not plainly wrong in charging the $15,000 and $1,000 against Capitol.

*Decree affirmed.*

---

[3] Capitol would write a check payable to Somerville in excess of its then available funds, exchange it for a Somerville check to Capitol in the same amount, cash the Somerville check, and thereafter when able make a deposit sufficient to cover its check to Somerville. Somerville made this arrangement possible by agreeing to hold each of Capitol's exchange checks until the necessary deposits had been made in Capitol's account.