Productora e Importadora de Papel, S.A. de C.V. *v.* Fleming.

PRODUCTORA E IMPORTADORA DE PAPEL, S.A. DE C.V. *vs.*
JAMES S. FLEMING.[1]

Worcester. September 15, 1978. — December 15, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Judgment*, Default. *Damages*, Deceit, Breach of sales contract. *Corporation*, Promoter. *Evidence*, Relevancy and materiality; Cross-examination; Opinion: expert.

A default judgment against a defendant in a civil action operated merely to establish the truth of factual allegations in the complaint and did not preclude the defendant from showing that the complaint failed to state a claim for relief. [832-835]

A corporate promoter is not liable, by reason of his promoter status alone and in the absence of an agency relationship between promoters, on pre-incorporation contracts made by other promoters. [835-837]

In an action by a buyer for breach of contract by a seller, the buyer, who had effected cover, was entitled by G. L. c. 106, § 2-712, to recover as damages the difference between the cover price and the contract price, increased by the incidental and consequential damages recoverable under § 2-715, and reduced by the expenses that the breach enabled the buyer to avoid. [837-841]

In an action by a buyer of newsprint against a seller for breach of contract, the judge erred in excluding questions designed to determine to what extent the buyer canvassed the newsprint market before effecting cover. [841-843]

---

[1] The following corporations and persons are also named as defendants in the plaintiff's original complaint, but they are not parties to the present appeal: Trans-Milpak, Incorporated, Trans-Milpak International, Incorporated, George W. Dietrich, Olga C. Dietrich, Sam A. Cravotta, Fernando Ysita-Septien, Eugene P. Courteney, and certain "[u]nnamed and unknown individuals and/or entities" otherwise described only as "John Does." The same also applies to the following defendants later added by motion: F.R.C. Realty Corporation, Dexter Realty Trust, and James S. Fleming as he is trustee of Dexter Realty Trust.

In an action by a buyer of newsprint against a seller for breach of contract, the judge did not abuse his discretion in excluding a question to an expert witness as to whether paper was actually available at the spot market price during the cover period. [843]

In an action by a buyer of newsprint against a seller for breach of contract, the judge did not abuse his discretion in declining to qualify as an expert on prices of newsprint during the cover period a newsprint broker familiar with the New England spot market for newsprint where there was no evidence relating this market to the one in which the buyer made its cover purchases. [843]

In an action for breach of contract, the judge erred in excluding questions to two witnesses concerning the name of a publication giving spot price quotations where the questions were permissible if aimed at establishing a foundation for admissibility as a trade publication under G. L. c. 233, § 79B, and were material to each witness's qualifications as an expert. [844]

In an action by a buyer against a seller for breach of contract, the judge did not err in excluding testimony to the effect that commercial credit was freely available during the cover period where the buyer had not asserted that tight credit increased the cover price. [844]

CIVIL ACTION commenced in the Superior Court on April 11, 1975.

The case was heard by *Meagher, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Robert C. Gerrard (Carolyn Thayer Ross* with him) for the plaintiff.

*James S. Fleming*, pro se, submitted a brief.

QUIRICO, J. The plaintiff, herein referred to as PIPSA, alleges in several counts of its complaint that the defendant, James S. Fleming, owes it $870,533.81 as the result of certain business transactions described below in this opinion. An interlocutory default judgment on the issue of liability was entered against Fleming because of his refusal to comply with an order of a judge of the Superior Court that he give a deposition. This was followed by an evidentiary hearing to assess damages, and a judgment was entered against Fleming for more than $1,000,000.

Fleming is appealing from that judgment, claiming error in several evidentiary rulings and in the amount of damages awarded. We hold that the judge failed properly to segregate the damages attributable to Fleming, and we therefore reverse.

The plaintiff is an entity apparently equivalent to a corporation. It was organized under the laws of Mexico and has its principal place of business in Mexico City. As its name suggests, PIPSA produces and imports paper products. Fleming is a Worcester attorney who entered the business of selling newsprint. It is necessary to set forth at considerable length the dealings and litigation between Fleming and PIPSA that led to this appeal. We rely primarily on PIPSA's complaint and exhibits annexed thereto.

About December 20 and 21, 1973, George W. Dietrich executed a newsprint supply contract with PIPSA in Mexico City. Although Dietrich purported to act as president of Trans-Milpak, Incorporated (TM), a Massachusetts corporation, TM was not actually formed until December 21, 1973. The agreement provided, in substance, that PIPSA should purchase from TM 30,000 metric tons of "standard, white, first-class newsprint appropriate for offset or letterpress printing" annually for the duration of the contract. The quantity was subject to revision by PIPSA during the first quarter of each contract year. The agreement was to continue in force from year to year, with PIPSA having the option to terminate after the first year and either party having such an option after the third year. Payment at the rate of $300 per metric ton, F.O.B. Boston, was to be in United States dollars against drafts drawn under irrevocable, confirmed letters of credit. The unit price was subject to annual adjustment on anniversaries of the agreement by reference to the Department of Commerce price index "and/or" price changes by Canadian producers. The agreement was to be interpreted under the laws of Mexico.

376 Mass. 826                                        829

Productora e Importadora de Papel, S.A. de C.V. *v.* Fleming.

Pursuant to its agreement with TM, on January 19, 1974, PIPSA sent a purchase order for 2,500 tons of newsprint at $300 per ton. Delivery was to occur at Veracruz during April of 1974. Although the record does not disclose how or why, the parties apparently modified this order to call for shipment of 1,893.9 tons at $330 per ton on or before October 25, 1974. Whatever the order may have provided, TM shipped 393.92 tons in several lots during October of 1974 and received payment at the rate of $330 per ton.[2] No further orders or shipments were made under the contract between PIPSA and TM.

About February 1, 1974, Fernando Ysita-Septien (Ysita), a Mexican attorney who was designated the Mexican representative of TM in the December 20 contract, negotiated a supply contract between PIPSA and Trans-Milpak International, Incorporated (TMI). In doing this, Ysita acted on the instructions of Fleming. Although Fleming purported to execute the agreement as president of TMI on or about February 1, TMI did not in fact become a corporation until March 26, 1974. The contract between PIPSA and TMI was for 10,000 metric tons of newsprint annually at an initial price of $290 per metric ton, and was otherwise identical to the contract between PIPSA and TM.

Pursuant to its contract with TMI, PIPSA placed four orders with TMI during 1974.[3] On January 31, 1974—the

---

[2] PIPSA initially procured an irrevocable credit in the amount of $750,000, sufficient to pay for 2,500 tons at the rate of $300 per ton. This credit was dated January 22, 1974, and was to expire on April 28, 1974. On May 31, 1974, however, the credit was apparently amended to expire on October 25, 1974, and to cover invoices up to $625,000. The amendment form also indicates a price of $330 per ton. This amended credit was sufficient to cover payment for 1,893.9 tons at the rate of $330 per ton. This tonage is exactly 1,500 tons more than TM eventually shipped under the order. Although the parties make no attempt to explain this amendment, we think it fairly inferable that PIPSA and TM agreed to modify the original order.

[3] The record contains translated copies of these four purchase orders that show TM as the seller. The three Spanish originals reproduced

day before the contract was executed by Fleming for TMI —PIPSA ordered 3,500 tons of paper at $300 per ton to be shipped during April of 1974. This order was subsequently modified by changing the price of 2,989 tons to $330 per ton and the delivery date to early November, 1974.[4] Between May and November of 1974, TMI shipped a total of 1,822.53 tons in response to this order, receiving a total of $593,922.83 in payment. On March 27, 1974— the day after TMI was incorporated in Massachusetts— PIPSA ordered an additional 5,000 tons of newsprint at $310 per ton for immediate delivery. This order, too, was apparently modified by changing the price to $330 per ton for delivery before January 12, 1975.[5] TMI shipped 1,536.90 tons at $300 per ton under this order before mid-January of 1975. PIPSA placed two orders on April 10, 1975, one for 3,000 tons and another for 4,500 tons, both at $300 per ton. TMI made no shipments referable to these orders.

To summarize the facts stated so far, PIPSA entered into contracts with TM and TMI before either of those entities was incorporated. Pursuant to its contract with TM, which required orders totaling 30,000 tons of newsprint before December 21, 1974, PIPSA actually ordered 2,500 tons and received only 393.92 tons. Pursuant to its contract with TMI, which required orders totaling 10,000 tons before February 1, 1975, PIPSA actually ordered 16,000 tons and received only 3,359.43 tons. For no reason apparent on the record, the prices stated in the purchase orders were not in compliance with the written agreements. Neither TM nor TMI ever completely filled one of PIPSA's purchase orders.

---

in the plaintiff's supplemental appendix are, however, clearly directed to TMI, and PIPSA alleged in its complaint that all four orders were to TMI.

[4] We infer the existence of a modification from the amended credit discussed in note 2, *supra.*

[5] See notes 2 and 4, *supra.*

376 Mass. 826                                    831

Productora e Importadora de Papel, S.A. de C.V. *v.* Fleming.

PIPSA filed suit in the Superior Court on April 11, 1975, naming TM, TMI, Fleming, and other individuals as defendants. The complaint set forth the facts summarized above and demanded judgment in the amount of $870,533.81, plus interest and costs against each defendant. As against the defendant Fleming, PIPSA asserted four separate claims. Count 6 of the complaint alleged the facts summarized above concerning TM and that "Fleming was a promoter and prospective incorporator" of TM. Count 7 alleged, in substance, that Ysita knowingly misrepresented the existence of TMI and of TMI's production capacity for the purpose of inducing PIPSA to contract with TMI, that Ysita acted as Fleming's authorized agent in so representing, that Fleming misrepresented the existence of TMI by signing the contract on TMI's behalf, and that PIPSA reasonably relied to its detriment on these misrepresentations. Count 10 alleged the facts summarized above concerning TMI and that "Fleming was a promoter and prospective incorporator" of TMI and executed the contract "purportedly on behalf of" TMI. Count 15, which the trial judge does not seem to have considered, alleged that all the actions complained of were unfair and deceptive business practices in violation of G. L. c. 93A and demanded treble damages against every defendant.

Fleming and other defendants who are not before us were served in this action on August 27, 1975. Fleming answered, essentially denying the material allegations of PIPSA's complaint. On January 13, 1976, PIPSA served a notice under Mass. R. Civ. P. 30 (b), 365 Mass. 780 (1974), to depose Fleming in Worcester on January 22. The deposition was rescheduled at Fleming's request to January 28, and on that date Fleming refused to be deposed. PIPSA obtained an order from a judge of the Superior Court on that same day compelling discovery. When the taking of the deposition was resumed later on January 28, Fleming still refused to testify. On PIPSA's motion filed January 30, the judge entered a default

against Fleming. See Mass. R. Civ. P. 37 (b) (2) (C), 365 Mass. 797 (1974). Thereafter on February 12, 1976, the judge entered an interlocutory default judgment against Fleming on the issue of liability. See Mass. R. Civ. P. 55 (b) (2), 365 Mass. 822 (1974). We note that PIPSA and the judge conformed exactly to the procedures outlined in the Massachusetts Rules of Civil Procedure for sanctioning wilful failure to give discovery. On April 12, Fleming's (newly retained) counsel filed a motion to set aside the default judgment against Fleming on the ground that Fleming had previously retained counsel who, without explanation, had failed to act for him. The judge denied this motion.

Following a hearing to assess damages, final judgment was entered against Fleming on November 2, 1976, in the amount of $879,419.03, together with interest in the amount of $140,707.04 and costs. Fleming appealed to the Appeals Court from the order assessing damages and from the final judgment. Acting on our own initiative, we ordered the case transferred to this court for direct appellate review. See G. L. c. 211A, § 10 (A).

1. *Segregation of damages.* During the hearing to assess damages, Fleming's counsel attempted to cross-examine a vice president of PIPSA to determine how many of the 18,500 tons of paper that PIPSA ordered were ordered from TM and from TMI, respectively. After an extensive colloquy and an offer of proof on Fleming's behalf,[6] the judge excluded the line of questioning as irrelevant. We hold that this ruling was erroneous.

(a) *Effect of default judgment on liability.* PIPSA advances two arguments to support the exclusion of evidence tending to show how many of the 18,500 tons were

---

[6] In the offer, counsel stated his expectation that the witness would testify that 15,000 tons were ordered from TM and only 3,500 tons from TMI. Although this contradicts the documentary evidence summarized earlier, counsel was entitled, under our holding later in this section of the opinion, to pursue his inquiry and to gain such an admission if he could.

376 Mass. 826                                    833

Productora e Importadora de Papel, S.A. de C.V. *v.* Fleming.

ordered from TM. First, PIPSA contends that the default judgment entered on counts 6, 7, and 10 of the complaint established Fleming's liability without regard to which corporate defendant breached its contract. In effect, PIPSA thus argues that count 6 could support a damage award even if it failed to state a claim for relief. We disagree.

We had occasion in *Plasko* v. *Orser*, 373 Mass. 40 (1977), to consider the preclusive effect of a default judgment entered, as here, under rule 37 (b) (2) (C) after failure to afford discovery.[7] We held in *Plasko* that the trial judge was not bound by an erroneous theory of damages stated in the plaintiff's complaint, but was instead obligated to "determine damages based on the correct interpretation" of the exhibit and other undisputed facts before him. *Id.* at 43-44. Our practice prior to adoption of the Massachusetts Rules of Civil Procedure was in accord. See *Moriarty* v. *King*, 317 Mass. 210, 217 (1944) (right of contribution undiminished by allegation of full liability).

*Plasko* and *Moriarty* are, perhaps, distinguishable from the present case as turning on the inconclusiveness of allegations concerning the measure of damages. Cf. 10 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2688, at 280 (1973) (default establishes truth of all allegations except those "relating to the amount of damages"). In at least one very early case we held, to phrase it in modern terms, that a default judgment cannot be entered on a complaint that fails to state a claim for relief. *Hemmenway* v. *Hickes*, 4 Pick. 497, 499-500 (1827). But cf. *Iasigi* v. *Shea*, 148 Mass. 538 (1889). So ancient a holding, made during an era of technical pleading rules, might not be thought persuasive in these days of notice pleading. See *Danning* v. *Lavine*, 572 F.2d 1386, 1388-

---

[7] *Plasko* is, of course, relevant to actions in either the Superior or District Courts because Mass. R. Civ. P. 37, 365 Mass. 797 (1974), is nearly identical to Dist. Mun. Cts. R. Civ. P. 37 (1975), which was directly involved in that case.

1389 (9th Cir. 1978) (general allegation of insolvency sufficient to support default judgment under modern pleading rules). Faced with an absence of reliable authority in our own cases, we turn to decisions construing the analogous Federal Rules of Civil Procedure. See, e.g., *Rollins Environmental Servs., Inc.* v. *Superior Court,* 368 Mass. 174, 179-180 (1975).

In Federal practice, two views of the scope of a default judgment have surfaced. See generally 10 C.A. Wright & A.R. Miller, *supra* § 2688, at 280-282. In *TWA* v. *Hughes,* 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973), the Second Circuit court espoused the view that a default judgment establishes not only that the well pleaded, material facts alleged in the complaint are true but also that the alleged actions were illegal and caused injury.[8] See *id.* at 70. In contrast, the Fifth Circuit court has held that a default merely establishes the truth of factual allegations and does not operate "as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Nishimatsu Constr. Co.* v. *Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975).

The difference between the rules of *TWA* and *Nishimatsu* is crucial here. Under the *Nishimatsu* approach, default on count 6 of the complaint would merely preclude Fleming from controverting his status as a promoter of TM and the other facts summarized in this opinion. He might still escape liability by showing that count 6 failed to state a claim for relief. Under the *TWA* approach, on the other hand, Fleming could make no such attack because the default would conclusively establish that his promoter status was causally linked to the injuries suffered by PIPSA.

We prefer the approach stated in *Nishimatsu.* As one commentator said in criticizing *TWA,* "even after default

---

[8] *TWA* involved a default judgment exceeding $145,000,000 entered, as here, following refusal of a party to be deposed. See 449 F.2d at 55-56.

it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 10 C.A. Wright & A.R. Miller, *supra* § 2688, at 282. This view represents the overwhelming weight of recent authority concerning the scope of a default judgment. *Southern Ariz. School for Boys, Inc.* v. *Chery*,        Ariz. App.     ,    -    (1978).[a] *Kohlenberger, Inc.* v. *Tyson's Foods, Inc.*, 256 Ark. 584, 589-590 (1974). *Bay Prods. Corp.* v. *Winters*, 341 So. 2d 240, 241-242 (Fla. App. 1976). *Lowe's of Raleigh, Inc.* v. *Worlds*, 4 N.C. App. 293, 295 (1969). *Pennsylvania Dep't of Environmental Resources* v. *Allias*, 20 Pa. Commw. Ct. 222, 225-226 (1975). *St. Paul Mercury Ins. Co.* v. *Nationwide Mut. Ins. Co.*, 209 Va. 18, 21-22 (1968). We therefore hold that the issue of the damages for which Fleming was liable under the allegations of count 6 that he was "a promoter and prospective incorporator" remained open during the hearing for the assessment of damages.

(b) *Effect of status as a promoter.* PIPSA's second argument in support of the ruling below is that Fleming was liable as a promoter of TM for TM's failure to perform its agreement with PIPSA. PIPSA did not allege, however, that Fleming took any part in the negotiations leading to the PIPSA-TM contract or that he authorized Dietrich to do so, and it did not allege that Fleming was a member of a partnership that would be bound by Dietrich's actions. Liability is claimed because "[u]nder Massachusetts law, promoters are personally liable for contracts made on behalf of a proposed corporation, even though the contract purports to bind the corporation, unless the contract expressly disclaims the liability of the promoters." Such is not, however the law of this Commonwealth.[9]

---

[a] 580 P.2d 738, 742-744 (1978).

[9] Notwithstanding that the written contract made Mexican law applicable and that the plaintiff and transactions in suit have obvious

Under the law of Massachusetts, a promoter may be personally liable for breach of a pre-incorporation contract he makes on behalf of the nonexistent corporation unless the circumstances demonstrate that the other party looked only to the corporation for performance. *Mansfield* v. *Lang*, 293 Mass. 386, 390-391 (1936) (breach of pre-incorporation employment contract at instance of defendant-promoter). *Reuter* v. *Ballard*, 267 Mass. 557, 562 (1929) (same). See also 1 W. Fletcher, Cyclopedia of the Law of Corporations § 190, at 36 (Cum. Supp. 1977) (general rule is personal liability of promoters absent novation). One promoter may be liable for obligations created by another promoter under normal agency principles, as when the promoters are joint venturers, *Hushion* v. *McBride*, 296 Mass. 4, 9-10 (1936), or when ratification occurs, *Storey* v. *Bickford*, 237 Mass. 284, 288-289 (1921). The courts of other States have held that, absent an agency relationship between the several promoters, a promoter is not liable as such for the improvidence of his copromoters. See *Daniel A. Pouwels & Assocs.* v. *Fiumara*, 233 So. 2d 16, 18 (La. App. 1970); *Mideastern Constr. Co.* v. *Hamlett*, 14 N.C. App. 57, 59, cert. denied, 281 N.C. 621 (1972); *Refrigeration Eng'r Co.* v. *McKay*, 4 Wash. App. 963, 975 (1971). We agree with these cases, and we hold that a corporate promoter is not liable, by reason of his promoter status alone and in the absence of an agency relationship between promoters, on pre-incorporation contracts made by other promoters.

Tested against these standards, the allegations in count 6 of the complaint, which concern only breaches by TM, are plainly insufficient to state a claim for relief against Fleming individually. Accordingly, the damage

connections with Mexico, the parties pleaded and tried this case as if Massachusetts law should govern. We will not disturb this tacit stipulation on the choice of law issues implicit in the case. *Commercial Credit Corp.* v. *Stan Cross Buick, Inc.*, 343 Mass. 622, 625 (1962). *Tsacoyeanes* v. *Canadian Pac. R.R.*, 339 Mass. 726, 728 (1959). Cf. G. L. c. 233, § 70.

award entered below is erroneous to the extent it holds Fleming answerable for TM's breach of contract or for Dietrich's misrepresentations, and there must be a new hearing to assess damages. We think it appropriate to discuss certain issues that will probably arise on remand. We emphasize, however, that our discussion concerns only those damages attributable to breaches by *TMI*, whether grounded on theories of contract or misrepresentation.

2. *Measure of damages.* During the first hearing on damages, Fleming objected to allowance of several items of damage. Fleming has not, however, briefed the issues thereby raised beyond asserting generally that the award was contrary to the evidence. We briefly discuss certain of these issues.

The judge awarded damages in four categories by reference to the Uniform Commercial Code provisions for cover and consequential damages. See G. L. c. 106, §§ 2-712, 2-715. The damages awarded were: (1) $738,562.12 excess cost of purchasing 9,880 tons of newsprint from alternative suppliers between May and September of 1974, (2) $20,509.97 cost of purchasing unused portions of letters of credit in favor of TM and TMI, (3) $44,227.30 in wasted import fees paid to the Mexican government on account of unshipped goods, and (4) $76,110.60 in dead freight charges under a voyage charter made by PIPSA to transport newsprint from Providence on an unspecified date. We conclude that the judge stated an appropriate measure of damages, but that there was error in the way he applied it to the facts of this case.

An obvious corollary of our holding in part 1 of this opinion is that Fleming can be personally liable for TMI's breach or breaches of contract by reason of his pre-incorporation involvement. PIPSA has argued at length that it is also entitled to benefit-of-the bargain damages on a deceit theory. See, e.g., *York* v. *Sullivan,* 369 Mass. 157, 165 (1975); *Goldman* v. *Mahony,* 354 Mass. 705, 709 (1968); *Rice* v. *Price,* 340 Mass. 502, 507 (1960). Under

such a theory, PIPSA could be "entitled to recover damages sufficient to give [it] the benefit of [its] contractual bargain, if such damages are reasonably proved." *Goldman* v. *Mahony, supra.* As we phrased the rule for calculating damages for deceit in *Rice* v. *Price, supra,* "The plaintiff is entitled to recover the difference between the value of what he has received and the actual value of what he would have received if the representations had been true." It is apparent from these formulations that PIPSA's recovery would be the same whether Fleming were liable on a deceit or on a contract theory: in either case, damages would be measured by the difference in value between the performance promised to PIPSA and that actually rendered. We therefore turn to a consideration of the elements of damage.

The Uniform Commercial Code provides an aggrieved buyer two alternative remedies when the seller repudiates or withholds delivery as TMI did here. See G. L. c. 106, § 2-711. The buyer may recover his economic loss measured by the difference between the market price and the contract price. G. L. c. 106, § 2-713. The buyer may instead effect "cover" by procuring substitute goods and may then recover the difference between the cover and contract prices. G. L. c. 106, § 2-712. In either case, the buyer may also recover the incidental and foreseeable consequential damages he incurred because of the seller's breach. G. L. c. 106, § 2-715. Also in either case, the buyer's damage recovery is to be reduced by the expenses he avoided by not having to perform the contract. G. L. c. 106, §§ 2-712 (2), 2-715 (1).

The apparent purpose of each of the alternative damage remedies is to place the aggrieved buyer in the same position as performance would have done. See G. L. c. 106, § 1-106 (1). When the buyer effects cover, as PIPSA did in this case, and subsequently recovers damages under § 2-712, he ends up in possession of equivalent goods and out of pocket in the amount he would have expended to obtain conforming goods from the defaulting seller under

376 Mass. 826                                        839

Productora e Importadora de Papel, S.A. de C.V. *v.* Fleming.

the contract. J. White & R. Summers, Uniform Commercial Code § 6-3, at 176-177 (1972). Calculation of cover damages under § 2-712 should, therefore, embody three steps. First, the judge should determine the aggregate difference between the cover price and the contract price. Second, the damage award should be increased by the incidental and consequential damages recoverable under § 2-715. Third, the award should be reduced, even to extinction, by the expenses that the breach enabled the buyer to avoid. E.g., *Barbarossa & Sons* v. *Iten Chevrolet, Inc.* 265 N.W.2d 655, 662 (Minn. 1978). Cf., e.g., *Magnolia Metal Co.* v. *Gale,* 189 Mass. 124, 132-133 (1905) (expenses of performance must be considered in calculating contract damages).

Our review of the record discloses that the judge overlooked these compensatory principles in assessing damages. First, the award should not have included the wasted import fees paid by PIPSA to the Mexican government. PIPSA would have paid these fees in order to earn performance under the contract with TMI. Moreover, any fees payable for unordered but agreed tonnage represent expenses saved because of TMI's breach and should be deducted from PIPSA's recovery. Second, transportation costs were handled incorrectly. Inasmuch as the February 1 writing called for shipments F.O.B. Boston, PIPSA saved the cost of shipping all but 3,359.43 tons of the agreed tonnage from Boston to Mexico City. The shipping expenses thus saved should also be deducted. The dead freight charges, on the other hand, were payments (in lieu of freight for unused cargo capacity) that PIPSA would not have had to make if TMI had tendered a full cargo. See G. Gilmore & C. Black, Admiralty § 4-9, at 216 (2d ed. 1975) (explaining "dead freight" term in voyage charter). Assuming that the agreement or a binding usage of trade required TMI to provide a complete cargo and that PIPSA's liability for dead freight charges was a foreseeable consequence of TMI's failure to provide such a cargo, these charges were proper items of consequential damages under G. L. c. 106, § 2-715 (2) (*a*).

There are further questions about the calculation of other items of damages which might be recoverable, depending on facts not yet resolved. One question is whether TMI agreed to pay for letters of credit procured by PIPSA. A second question is whether PIPSA's cover purchases between May and September of 1974 can be considered in substitution for the first two purchase orders when, as evidenced by the amended letters of credit, deliveries were permitted after September.[10] A third question is why PIPSA did not seek to recover its economic loss on those goods it ordered or agreed to order from TMI but which it did not replace by cover contracts. Compare *Flood* v. *M.P. Clark, Inc.*, 335 F. Supp. 970, 971 (E.D. Pa. 1971) (damages available only to extent of cover: course of performance evidenced modification of quantity term), with *Chemetron Corp.* v. *McLouth Steel Corp.*, 522 F. 2d 469, 472 (7th Cir. 1975) (damages available on entire agreed quantity: seller's breach excused placement of further orders). Each of these three questions of fact must be resolved by the trial judge in the first instance, and we express no opinion as to what that resolution might be.

We note one final problem with the award below. PIPSA's conclusory statement that cover cost it a certain sum above the contract price, without further details of its cost, renders impossible the judicial task of determining whether the correct measure of damages and all the factors which go into the determination of PIPSA's damages were included and considered by the judge in assessing the damages. PIPSA need not prove its damages with mathematical exactness. *R.N. Kelly Cotton Merchant, Inc.* v. *Cox*, 295 Ala. 94, 97-98 (1976). See *Matsushita Elec. Corp. of America* v. *Sonus Corp.*, 362 Mass. 246, 264 (1972).

---

[10] The allegations in PIPSA's complaint that TMI's late deliveries were not in conformity with the contract are inconclusive if other record evidence shows otherwise. See *Nishimatsu Constr. Co.* v. *Houston Nat'l Bank*, 515 F.2d 1200, 1206-1207 (5th Cir. 1975) (exhibits considered together with complaint to determine facts established by default).

Moreover, PIPSA need not show in detail how each cover purchase was related to a missing shipment from TMI. See *Farmer's Union Co-op Co.* v. *Flamme Bros.*, 196 Neb. 699, 706-707 (1976). It is essential, however, that the judge be able to determine whether, when, and why PIPSA and TMI ever agreed to modify the contract price and to assess damages based on the agreed price. Cf. *Gardino* v. *Caribbean Lumber Co.*, 447 F. Supp. 1337, 1342 (S.D. Ga. 1978) (damages based on original, lower contract price when seller breached amended contract).

3. *Evidentiary rulings.* What we have already said perhaps sufficiently disposes of the present appeal. We think it advisable, however, to deal briefly with the various evidentiary issues that the parties raised below and briefed.

(a) PIPSA's only witness during the damage-assessment hearing was Mario Ayluardo, PIPSA's vice president of product importers. On direct examination, Ayluardo testified concerning PIPSA's cover purchases. On cross-examination, Fleming's counsel attempted to determine the extent to which PIPSA canvassed the newsprint market. Counsel elicited Ayluardo's statement that PIPSA inquired of its regular suppliers seeking additional paper. Counsel was not permitted, however, to ask whether PIPSA made "inquiry of any other major paper companies manufacturing in the United States" or to ask any further questions in the same vein. The basis for this exclusion is not apparent.

The reasonableness of PIPSA's cover purchases is made an issue by the same statute that authorizes the remedy of cover damages. G. L. c. 106, § 2-712 (1). See 2 R. Anderson, Uniform Commercial Code § 2-712:4, at 432 (2d ed. 1971) (buyer must make reasonable cover purchase). Evidence that PIPSA made few or no inquiries to suppliers of substitute newsprint would tend to show that it acted unreasonably. Because the excluded line of questioning was designed to elicit such clearly relevant testimony, it was presumptively permissible.

In support of the exclusion PIPSA argues first that the answers would have been hearsay because they were offered to prove the truth of the out-of-court statements of paper suppliers to whom inquiries were directed. Counsel did not, however, ask what responses PIPSA received from its inquiries: he asked whether inquiries were ever made. Any out-of-court statements by PIPSA in the course of its inquiries would have been offered only to show those statements were made, not to establish the truth of the matter—desired quantities, delivery dates, and so on—asserted therein. Accordingly, the objection on hearsay grounds is not persuasive. See *Sokoloski* v. *Splann*, 311 Mass. 203, 209 (1942) (statement offered to show it was made not hearsay).

PIPSA argues next that the specific question about "major" suppliers was defective in form and excludable either under the opinion rule or for indefiniteness. We think the question could have been admitted or excluded in the discretion of the judge. We see no real harm in allowing Ayluardo, who was an officer of a newsprint importing firm and who had been questioned about the relevant market and time period, to answer this specific question. Moreover, a defect in this one question would not justify excluding the entire line of inquiry.

Finally, and most plausibly, PIPSA argues that the judge did not abuse his discretion in limiting the scope of cross-examination. Indeed, the judge himself stated that he was heading off what he perceived to be a "fishing" expedition. It is true that a trial judge has broad discretion to keep cross-examination within reasonable bounds. E.g., *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 308-309 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). There is, however, much less discretion to limit examination of a party-opponent designed to elicit new matter. McCormick, Evidence § 29, at 58 (2d ed. 1972) (development of new matter should be governed by ordinary relevancy standards). See

*Civitarese* v. *Gorney,* 358 Mass. 652, 657 (1971) (error to exclude relevant questions on "cross" examination of adverse party's agent called by proponent). The excluded inquiry was relevant to an issue in the case, and Ayluardo was already on the stand and able to testify. Provided that counsel did not belabor his questions, he should have been permitted to ask his questions then instead of waiting to call the witness pursuant to G. L. c. 233, § 22.

(b) Fleming's counsel called Loring Saltus, a local newsprint broker who had about five years' experience, and qualified him as an expert to give the market price of newsprint in the Boston area during the cover period. After some confusion over whether he was testifying about prices per metric ton or per short ton, Saltus was allowed to state on redirect that the spot market price for the newsprint specified in the contract was about $286 per metric ton in Boston during the relevant time period. Counsel for Fleming then asked Saltus whether paper was actually available at the quoted price, and the judge excluded the question. Although we might permit the question, the judge had discretion not to. See *Carlson* v. *Holden,* 358 Mass. 22, 25-26 (1970); *Commonwealth* v. *Douglas,* 354 Mass. 212, 225 (1968), cert. denied, 394 U.S. 960 (1969); *Sullivan* v. *Brabason,* 264 Mass. 276, 285 (1928).

(c) Fleming's counsel called Donald Whittemore, a newsprint broker, and attempted to qualify him as an expert on the prices of newsprint during the cover period. The judge ruled Whittemore unqualified. Whittemore's testimony estalished, perhaps, his familiarity with the New England spot market for newsprint. Without evidence relating this market to the one in which PIPSA made its cover purchases, Whittemore's expertise, if any, was only marginally relevant to the issues in the case. We therefore find no abuse of the judge's discretion in declining to accept Whittemore as an expert. See *Matsushita Elec. Corp. of America* v. *Sonus Corp.,* 362 Mass. 246, 265 (1972); *Snow* v. *Merchants Nat'l Bank,* 309 Mass. 354, 362 (1941).

(d) The judge excluded questions by Fleming's counsel designed to elicit from Whittemore and Saltus the name of a publication giving spot price quotations. Each question occurred while counsel was attempting to establish the expert qualifications of each witness. We think the questions were permissible. If the questions were aimed at establishing a foundation for admissibility as a trade publication under G. L. c. 233, § 79B, there was no need for counsel first to qualify Whittemore or Saltus as an expert on prices. Cf. *Mazzaro* v. *Paull,* 372 Mass. 645, 652-653 (1977). In any event the questions were clearly material to each witness's qualifications.

(e) There was no error in excluding testimony by Thornton Banks to the effect that commercial credit was freely available during the cover period. Fleming's counsel sought by that testimony to rebut any assertion by PIPSA that tight credit increased the cover price. Inasmuch as PIPSA never made such an assertion, the offered evidence was irrelevant.

4. *Conclusion.* For the reasons stated in part 1 of this opinion, the judgment must be reversed for a reassessment of damages. The case is remanded to the Superior Court Department for further proceedings consistent herewith.

*So ordered.*