In re: DAVID'S & UNIQUE EATERY, a Co–Partnership Consisting of Elsa Fairneny and David Fairneny, Debtor.

Joseph B. COLLINS, Esq., Trustee of David's and Unique Eatery, a Co–Partnership Consisting of Elsa Fairneny and David Fairneny, Plaintiff,

v.

PUB DENNIS OF HADLEY, INC. and Dennis N. Beausoleil, Defendants.

Bankruptcy No. 79–01443G.
Adv. No. 86–4024.

United States Bankruptcy Court,
D. Massachusetts.

July 9, 1987.

Jonathan Sapirstein, Kamberg, Berman & Gold, Springfield, Mass., for Joseph B. Collins, Trustee plaintiff.

Paul D. Gallese, Shocket, Dockser & Associates, Natick, Mass., for Pub Dennis of Hadley, Inc. and Dennis N. Beausoleil/defendants.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Motions for summary judgment with respect to two counts of the complaint raise issues under contract law concerning impracticability of performance, as well as issues under corporate law as to liability of a corporate promoter and liability of the corporation under *de facto* existence and under subsequent *de jure* existence.

The material facts are not in dispute. On January 11, 1985, Joseph B. Collins (the "Trustee"), in his capacity as Trustee in bankruptcy of a partnership entitled David's and Unique Eatery (the "Debtor"), entered into a written agreement with an entity called Pub Dennis of Hadley, Inc. (the. "Buyer") for the sale to the Buyer of the Debtor's all alcoholic beverage license and goodwill. The agreement was signed on behalf of the Buyer by the defendant, Dennis N. Beausoleil, ("Beausoleil"), as its President. It described the Buyer as a Massachusetts corporation. The Debtor previously had utilized the license at premises that it formerly had leased in Hadley, Massachusetts. The agreement made no mention of these premises. The parties' obligations were contingent upon approval of the transfer by this Court, by the Licensing Board of the Town of Hadley and by the Alcoholic Beverage Control Commission of the Commonwealth of Massachusetts.

Unbeknown to either of the parties, the Buyer had not, as of January 11, 1985, achieved corporate status. On January 4, 1985, Beausoleil had executed articles of organization which sought to incorporate the Buyer under Massachusetts law, and left them with his attorney. The articles named Beausoleil as President, Treasurer and sole director of the Buyer. For some unexplained reason, the articles were not received for filing by the Secretary of the Commonwealth of Massachusetts until February 4, 1985, at which time they were approved and deemed filed by him. By August 13, 1985, approval of the transfer of the liquor license was secured from this Court and from both of the licensing authorities, who also approved Beausoleil as manager. A license for the year 1985 was issued in the Buyer's name.

The event that gave rise to this litigation then occurred. The Buyer was unsuccessful in obtaining a lease of the premises formerly occupied by the Debtor. Its negotiations with the owner apparently broke down over some irreconcilable differences. Although the Town issued a license to the Buyer for the year 1986, the Buyer failed to pay the fee for that year, and the Town revoked the license in early 1986. Unavailing in his demands for payment, the Trustee commenced suit against both the Buyer and Beausoleil. The Trustee now moves for summary judgment on two counts in his complaint, a count against the Buyer for breach of contract and one against Beausoleil for liability on the breach as a promoter.

## I. DEFENSE OF IMPRACTICABILITY

The defendants argue that the inability of the Buyer to obtain a lease of the premises was a supervening event which made its performance impracticable, thus excusing performance.

■ The defense of impracticability is dealt with in § 261 of the *Restatement (Second) of Contracts*, which reads as follows:

> When, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*Restatement (Second) of Contracts* § 261.[1] The principle of law espoused by § 261 is not as helpful to the non-performing party as this language might suggest. Foreseeability of the supervening event can make the defense of impracticability unavailable, unless there was a practical difficulty in the parties reaching agreement on the contingency because of the complexity presented by a number of such contingencies. *Restatement (Second) of Contracts* § 261 Comment 1. The type of event to which § 261 refers is generally an act of God or an act of a third party; if, however, performance depends upon some act of a third party, the failure of the third party to cooperate does not ordinarily provide a discharge because this is a risk that is commonly understood to be on the contracting party. *Id.* The essence of the defense of impracticability is that the cause for nonperformance must be some extreme or unreasonable difficulty which could not reasonably be expected to be within the contemplation of the parties at the time they made their contract. S. Williston, *A Treatise on the Law of Contracts* § 1932 (3rd ed. 1961 & Supp.1978).

The Massachusetts decisions appear to be in accord. In *Center Garment Co., Inc. v. United Refrigerator Co.*, 369 Mass. 633, 341 N.E.2d 669 (1976), the Massachusetts Supreme Judicial Court applied the provisions similar to § 261 of the *Restatement of Contracts* which are contained in § 2–615 of the Uniform Commercial Code

(MASS.GEN.LAWS ANN. ch. 106, § 2–615 (LAW. Co-op.1984))[2] governing nonperformance by a seller of goods. The court held that the failure of a seller's supplier to deliver goods needed for the seller's performance was not the type of event which excuses performance under § 2–615.

We conclude that the defense of impracticability is not available here. Even if inability to obtain a lease may be regarded as rendering the Buyer's performance impracticable, the circumstances do not justify nonperformance. Negotiations with the landlord were clearly required. The landlord's refusal to cooperate was not unforeseeable. It could have and should have been covered by the contract. Nor do we regard the Buyer's failure to obtain a lease as rendering performance impracticable in the first place. The license could still have been purchased. True, the licensing authorities could cancel the license if the license holder did not have premises acceptable to them from which to operate, *see* MASS.GEN.LAWS ANN. ch. 138, § 12 (LAW. Co-op.1981), but an issued license may be transferred from one location to another. MASS.GEN.LAWS ANN. ch. 138, § 23 (LAW. Co-op.1981). There is no indication that the premises formerly occupied by the Debtor are the only premises in the Town of Hadley from which the license holder would be permitted to operate. Thus, the Buyer is not saved by the principle of the *Restatement of Contracts* § 263 which excuses nonperformance where the

1. Other sections give specific, but nonexclusive, applications of the broad principle contained in § 261, e.g., supervening death of a party (§ 262), supervening destruction or damage of the subject matter (§ 263), supervening prohibition by law (§ 264).

2. Section 2–615 provides:

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable for-

eign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture.

He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

MASS.GEN.LAWS ANN. ch. 106, § 2–615 (LAW. Co-op.1984).

existence of a particular thing is necessary for a party's performance. The existence of the lease was not necessary for the Buyer's performance.

## II. CLAIM AGAINST THE BUYER

There is no question that the Buyer had not attained *de jure* corporate existence when the sales agreement was signed on January 11, 1985. The existence of a corporation under Massachusetts law does not begin until the articles of organization become effective after filing. MASS.GEN. LAWS ANN. ch. 156B, § 12 (LAW.Co-op. 1979). The question is whether the Buyer was then bound as a *de facto* corporation or, if not, whether it became bound after achieving *de jure* status on February 4, 1985.

### A. De Facto Status

■ Fletcher defines a *de facto* corporation as follows:

A *de facto* corporation may be defined as one so defectively created as not to be a *de jure* corporation, but nevertheless the result of a bona fide effort to incorporate under existing statutory authority, coupled with the exercise of corporate powers, and recognized by the courts as such upon the ground of public policy in all proceedings except a direct attack by the state questioning its corporate existence. W. Fletcher, *Cyc. Corp.* § 3761 (perm. ed.).

The Supreme Judicial Court of Massachusetts has had few occasions to deal with the doctrine of *de facto* incorporation. It has recognized the doctrine, *see e.g., Bancroft v. Cook*, 264 Mass. 343, 349, 162 N.E. 691 (1928), although one early decision contains no clear distinction between *de facto* and *de jure* corporations, *Merrick v. Reynolds Engine and Governor Company*, 101 Mass. 381 (1869), and another refuses to find *de facto* existence at all, *Montgomery v. Forbes*, 148 Mass. 249, 19 N.E. 342 (1889). *Cf. Merchants' National Bank of Bangor v. Glendon Company*, 120 Mass. 97 (1876). Unlike the Model Corporation Act, the Massachusetts business corporation statute, MASS.GEN.L. ch. 156B, con-

tains no provision which can be interpreted as rejecting the doctrine. *Compare Model Business Corporation Act* § 56. *See* W. Fletcher, *Cyc. Corp.* § 3761 (perm. ed.). We therefore conclude that the Massachusetts courts would find *de facto* corporate existence in the proper circumstances in accordance with the weight of authority elsewhere.

■ These are not, however, the proper circumstances. As of the time of the agreement of January 11, 1985, those acting on behalf of the corporation to be formed had not made *bona fide* efforts to incorporate. Beausoleil certainly had done his part, having signed the articles of organization and left them with his lawyer. But the lawyer hardly held up his end. There is no indication that he had even mailed the articles for filing by January 11th. Failure to attempt to file incorporation papers indicates the absence of a *bona fide* attempt to incorporate. *Kiamesha Development Corp. v. Guild Properties, Inc.*, 4 N.Y.2d 378, 175 N.Y.S.2d 63, 151 N.E.2d 214 (1958); *Willis v. City of Valdez*, 546 P.2d 570 (Alaska 1976).

### B. Later Acceptance by Buyer of Contract's Terms

■ The question remains whether the Buyer became liable under the contract by reason of its conduct subsequent to coming into existence on February 4, 1985. The Massachusetts decisions in this area of the law are also of rather ancient vintage and far from models of clarity or consistency. In *Abbott v. Hapgood*, 150 Mass. 248, 22 N.E. 907 (1889) the court opined: "If a contract is made in the name of and for the benefit of a projected corporation, the corporation after its organization cannot become a party to the contract, even by adoption or ratification of it." *Id.* at 252, 22 N.E. 907 (citations omitted). Later decisions, however, have greatly reduced the force of this statement. In *Holyoke Envelope Co. v. United States Envelope Co.*, 182 Mass. 171, 65 N.E. 54 (1902), the court suggested, by way of dictum, two theories upon which the new corporation can become liable: (1) treating the prior agree-

ment as containing a continuing offer which the corporation accepts by receiving benefits under the contract; (2) regarding the conduct of both parties after incorporation as creating an implied contract. In *Mansfield v. Lang*, 293 Mass. 386, 200 N.E. 110 (1936) the Massachusetts court seemed to continue its retreat from *Abbott v. Hapgood* although it again did not rule directly on the question of corporate liability. In holding on the facts before it that a promoter remained liable because no later novation releasing him took place, the court certainly seemed to indicate that it would recognize the validity of a novation whereby the corporation assumed the obligation as the sole obligor. In light of these subsequent decisions, the First Circuit has concluded that the continuing offer theory is valid under Massachusetts law. *See Framingham Savings Bank v. Szabo*, 617 F.2d 897 (1st Cir.1980). We are bound by that conclusion, which, in any event, appears to be well reasoned and a correct interpretation of Massachusetts law. *See* W. Fletcher, *Cyc. Corp.* § 207 (perm. ed.).

■ Viewing the January 11, 1985 contract as containing a continuing offer to transfer the license to the Buyer, it is apparent that the Buyer's conduct after it came into existence constituted an implied acceptance of that offer. The Buyer thereafter filed applications with both licensing authorities for issuance of the license in its name. After the initial issuance, it filed an affidavit with the Town for renewal of the license during 1986, and received the 1986 license issued in its name. To the extent it is a question of fact, I find that there has been acceptance by the Buyer. *Compare* with *Mansfield v. Lang*, 293 Mass. 386, 200 N.E. 110 (1936). The Buyer therefore became bound under the terms of the January 11, 1985 contract.

### III. CLAIM AGAINST BEAUSOLEIL

■ Our ruling that the Buyer had no *de facto* existence at the time of the January 11th contract leaves Beausoleil exposed to potential liability as the signatory on behalf of an unincorporated entity. We nevertheless conclude, under principles of equitable estoppel, that the Trustee cannot assert this liability.

This case is quite different from the typical one involving a contract signed by a promoter who is acting for the benefit of a corporation which both parties realize has yet to come into existence. In such cases, if the promoter is not bound, then no one is, and the parties' intent to enter into a present contract becomes frustrated, a conclusion which the courts have rejected. *See Reuter v. Balland*, 267 Mass. 557, 166 N.E. 822 (1929); *Productora E Importadora De Papel, S.A.deC.V. v. Fleming*, 376 Mass. 826, 383 N.E.2d 1129 (1978). The central question there is usually whether the promoter has been released rather than whether he incurred liability in the first place. *See* W. Fletcher, *Cyc. Corp.* § 190 (perm. ed.).

Although there is conflict on application of equitable estoppel in these circumstances now before the Court, one leading authority favors application of the doctrine. *See* W. Fletcher, *Cyc. Corp.* §§ 3902, 3910, 3989, 3998 (perm. ed.). Massachusetts has applied the doctrine to estop those who purport to associate in a corporate enterprise from denying the existence of the corporation. *See Bancroft v. Cook*, 264 Mass. 343, 162 N.E. 691 (1928); *Kelley v. Newburyport and Amesbury Horse Railroad Company*, 141 Mass. 496, 6 N.E. 745 (1886). We have not been directed to any Massachusetts decision which estops a party who is not a corporate promoter or associate from denying the existence of the corporation. It is true that estoppel of the corporate promoter is the classic instance of equitable estoppel because it is the promoter's conduct which creates the appearance of incorporation upon which a third party relies. Here, the Buyer had nothing to do with the Debtor's incorporation and merely recognized its existence based upon the implied representation of Beausoleil. *See Timberline Equipment Co., Inc. v. Davenport*, 267 Ore. 64, 514 P.2d 1109 (1973). The principle of equitable estoppel, however, is sufficiently broad to depend upon the general equities of the situation. One party's recognition of the other's cor-

porate existence and his intention to contract with the other party as a corporation can constitute adequate grounds to form the basis of estoppel. *Cranson v. International Business Machines Corp.*, 234 Md. 477, 200 A.2d 33 (1964); W. Fletcher, *Cyc. Corp.*, § 3989 (perm. ed).

The Trustee, in thinking that he was contracting with a corporation, clearly intended to bind only the Buyer and not Beausoleil personally. Having previously recognized the corporate existence of the Buyer, he now seeks to assert a liability which is contrary to that recognition. If the Buyer did not become bound under the contract after it came into its corporate existence, the Trustee's prior recognition of that corporate existence should not estop him from imposing personal liability upon Beausoleil, because otherwise he would be left with no party liable under the contract. But our holding that the Buyer is contractually bound gives the Trustee exactly what he bargained for. Beausoleil is certainly blameless. He acted in good faith in believing that the Buyer had been incorporated. *See Harrill v. Davis*, 168 F. 187 (8th Cir.1909). Thus, estoppel is equitable in these circumstances.

## IV. SUMMARY JUDGMENT

For the foregoing reasons, the Trustee is entitled to summary judgment against the Buyer on Count I of his complaint, and his motion for summary judgment against Beausoleil on Count II is denied. Beausoleil has not filed a cross motion requesting summary judgment in his favor on Count II. Summary judgment, nevertheless, should be granted him unless to do so would unfairly preclude the Trustee from contending that there is a genuine issue of material fact to be tried. 6 J. Moore, W. Taggert & J. Wicker, *Moore's Federal Practice* § 56.12 (ed. 1987). We do not believe that the Trustee would be prejudiced. There is no dispute that the Trustee intended to contract with a corporate entity and that he recognized the existence of that entity. Beausoleil's good faith is also obvious. Accordingly, he shall be granted summary judgment on Count II.