SAKYO FURUKAWA[1] *vs.* ARBELLA MUTUAL INSURANCE
COMPANY.

No. 00-P-885.

Middlesex. April 12, 2002. - September 4, 2003.

Present: ARMSTRONG, C.J., MASON, & GRASSO, JJ.

*Insurance,* Underinsured motorist, Consent to settlement.

This court concluded that an insurer providing underinsured motorist coverage
under a motor vehicle insurance policy was not, by virtue of having
consented to its insured's settlement with the alleged tortfeasor, precluded
from later contesting the tortfeasor's liability or, therefore, its own liability
for coverage of damages in excess of the settlement. [143-146]

CIVIL ACTION commenced in the Superior Court Department on
May 23, 1997.

Motions for summary judgment and for reconsideration were
heard by *Wendie I. Gershengorn,* J.

*Robin Aaronson Maher* for the defendant.

*Rachel H. Prindle* for the plaintiff.

ARMSTRONG, C.J. Sakyo Furukawa, at the time of the accident
a four year old child, ran between parked cars into the street
and was struck by a vehicle driven by one Kofman and insured
by Trust Insurance Company (Trust). Although police reports
and other evidence furnished little proof that Kofman's driving
had been negligent, Trust agreed to cover the damage up to the
one-person limit of Kofman's bodily injury liability insurance
($20,000), conditioned on a release from any further liability
claim against Kofman. Sakyo's actual medical expenses ap-
proached $60,000.

The Furukawas' family car was insured by the defendant Ar-
bella Mutual Insurance Company (Arbella) and carried underin-

---

[1]By his parent and next friend, Takahisa Furukawa.

sured motorist coverage with $100,000-$300,000 limits, available if one legally responsible for an accident should have bodily injury liability insurance inadequate to cover the damages fully. The policy required the Furukawas to obtain Arbella's consent prior to consummating any settlement with one allegedly liable. Accordingly, the Furukawas' counsel provided notice to Arbella that he was in settlement discussions with Trust and that, in view of Kofman's inadequate liability insurance, he would be looking to the Arbella policy for further contribution toward paying Sakyo's medical bills. On December 24, 1996, the Furukawas' counsel wrote to Arbella informing it that Trust was prepared to settle for $20,000, the limit of its policy. In response, on January 6, 1997, Arbella in writing consented to the settlement provided that the full coverage amount was to be paid.[2] Armed with the consent, the Furukawas entered into the settlement with Kofman on February 7, knowing that Arbella had up to that point left unanswered the question previously posed by the Furukawas' counsel of whether it would be contesting the question of Kofman's liability for the accident. On the day of the settlement the Furukawas' counsel wrote a letter to Arbella arguing that Arbella, by consenting to the settlement, had *implicitly* conceded liability.[3] He cited *Aetna Cas. & Sur. Co.* v. *Poirier*, 371 Mass. 257, 261 (1976), in the letter, as he does in his brief, for the proposition that "any settlement made in response to a claim of legal responsibility conclusively establishes the existence of legal responsibility for the purposes of [the statute governing underinsured motorist coverage, G. L. c. 175,] § 113L." From this, counsel argued, as

---

[2]The actual amount of the settlement, as contrasted with Kofman's liability coverage, was of concern to Arbella because the underinsured motorist clause of the motor vehicle policy in effect at the time of the accident in 1996 called for coverage of "unpaid damages up to the difference between the total amount collected from [the tortfeasor's] bodily injury liability insurance . . . and the 'per person' limit [of the Furukawas' underinsured motorist coverage]." Contrast the underinsured motorist coverage in effect in 1980, see *MacInnis* v. *Aetna Life & Cas. Co.*, 403 Mass. 220, 227 n.13 (1988), which covered the difference between the tortfeasor's liability *coverage* and actual damages up to the underinsured motorist coverage limit.

[3]In that letter, the Furukawas' counsel acknowledged a telephone conversation, the time of which is not mentioned, in which Arbella made clear that it would contest liability. The Furukawas' counsel argued in the letter that this position violated G. L. c. 176D and G. L. c. 93A.

he does now, that Arbella, having consented to the settlement, could not contest Kofman's liability or, therefore, its own liability for damages in excess of the settlement.

The argument misreads the holding of the *Poirier* case. Read in context, the statement in *Poirier* meant only that Poirier's administratrix, as a party to the settlement with an alleged tortfeasor, would not be heard to claim thereafter that the alleged tortfeasor was blameless, in order to accommodate a claim against Poirier's own insurer.[4]

The *Poirier* fact pattern was unique. Poirier had been a passenger on a motorcycle and had been fatally injured as a result of a collision of the motorcycle with a taxicab. The motorcycle had no liability insurance that covered Poirier's injuries and thus was an uninsured vehicle for purposes of Poirier's own motor vehicle policy. The Poirier policy had uninsured motorist coverage in the amount of $5,000, applicable if no person legally responsible for the accident had liability insurance to cover Poirier's injuries. The taxicab *was* insured; its insurer paid Poirier's administratrix $5,000 in settlement of her claims for damages. The administratrix then tried to recover on Poirier's own uninsured motorist coverage, focusing on the uninsured motorcycle driver. In response to the insurer's objection that the administratrix had already collected the $5,000 policy limit from the insurance of a "person or organization [i.e., the taxicab] who may be legally responsible [for damages]," *id.* at 260, the administratrix relied on a finding by an arbitrator that the taxicab, despite settlement, had not in fact been legally liable for the accident. The court rejected the argument, holding that the administratrix, as a party to the settlement with the taxicab company, would not be allowed, in claiming against Poirier's own insurer, to take the inconsistent position the taxicab was not, after all, liable for the accident despite its having settled. It was in that context that the court said: "We think any settlement made in response to a claim of legal responsibility conclusively establishes the existence of legal liability for

---

[4]The strategy of Poirier's administratrix was presumably to avoid the provision of the policy making coverage unavailable to an insured who, without the insurer's consent, settled with one "who may be legally liable." See *Aetna Cas. & Sur. Co.* v. *Poirier*, 371 Mass. 257, 260 (1976).

the purposes of [the uninsured motorist statute]. . . . The [insured[5]] should not have it both ways." *Id.* at 261.[6] In context and in intent, the court meant that the agreement established legal responsibility as between the parties to the agreement. It would distort the holding and would be fundamentally unsound to say that the settlement could fix liability as to one *not* a party to the agreement.

There would be no sound reason to require the insurer that provides underinsured coverage to withhold its consent to a settlement with the alleged tortfeasor as a condition of being able later to contest the tortfeasor's liability in relation to its coverage of excess damages. There are many reasons why the alleged tortfeasor's liability insurer might choose not to contest liability, particularly where the coverage limit is small in relation to the likely cost of a successful defense.[7] Why should the victim's own insurer of uncovered damages be forced to oppose a settlement beneficial to its own policyholder to preserve its right to contest its own liability, with, as here, far larger exposure limits?

The consent of the underinsured coverer does not make it in any sense a full party to the settlement. At most, its commitment, implicit in its consent, should be to abide by the provision not to seek from the settling tortfeasor damages in excess

---

[5]The word "defendant" was used, meaning Poirier's administratrix, claiming on his insurance. *Id.* at 261.

[6]Because the *Poirier* case was decided on that ground, the court did not need to reach the question whether Poirier waived his uninsured motorist coverage by entering into a settlement with an alleged tortfeasor without first obtaining the consent of his own insurer. *Id.* at 262. That question was answered later by the decision in *MacInnis* v. *Aetna Life & Cas. Co.*, 403 Mass. 220, 226-228 (1988).

[7]A default judgment, by contrast, constitutes an admission of the well-pleaded factual allegations of the claimant's complaint. *Productora e Importadora de Papel, S.A. de C.V.* v. *Fleming*, 376 Mass. 826, 834-835 (1978). Thus, this case is distinguishable from cases that the plaintiff cites, such as *Bryant* v. *Clark*, 62 Ohio St. 3d 485, 488 (1992) ("An insurer that consents to a default judgment in a suit against an uninsured motorist, and does not request arbitration until after that judgment has been entered, has waived its right to submit the issues of liability and damages to arbitration"), and *Booth* v. *Seaboard Fire & Marine Ins. Co.*, 285 F. Supp. 920, 925 (D. Neb. 1968), reversed on other grounds, 431 F.2d 212 (8th Cir. 1970) (insurer waived its right to arbitration by consenting to insured's suit against uninsured motorist, which resulted in default judgment).

of those specified in the agreement. See *Funai* v. *Metropolitan Property & Cas. Co.*, 145 N.H. 642, 645 (2000) (insurer's consent constituted waiver of its rights vis-à-vis underinsured motorist but not waiver of its right to demand trial against plaintiff; "[w]hen Metropolitan consented to settle, it did so to protect its interests as against the uninsured motorist"). That is the only legitimate purpose for requiring the consent of the victim's own insurer: to enable it to protect its own assets by preventing its insured, the victim, from unilaterally cutting off its access to recovery (via subrogation) of moneys it pays out as underinsured benefits. See *MacInnis* v. *Aetna Life & Cas. Co.*, 403 Mass. 220, 222-223 (1988). See also *Lighter* v. *Lumbermans Mut. Cas. Co.*, 43 Mass. App. Ct. 415, 417-418 (1997) (insurer not prejudiced where tortfeasor had no assets).

It is suggested that the victim stands to be sandbagged unless his insurer's consent to the settlement is given the legal effect of precluding it from later contesting liability; this, because the victim, in reliance on the larger underinsured driver limits, will have given up the possibility of recourse to the tortfeasor's own assets. Such reliance by the victim, however, would be reasonable only if one starts from the premise that a consent would have that legal effect; it is not a reason for giving a consent that effect, and giving it that effect might unnecessarily burden the victim's opportunity to obtain contribution from an alleged tortfeasor seeking to avoid litigation.

The judgment dated March 14, 2000, is to be modified by striking the first numbered paragraph and entering in its place a declaration that Arbella Mutual Insurance Company has not waived its right to arbitrate the subject of Kofman's legal liability for the accident that occurred June 12, 1996. As so modified, the judgment is affirmed.

*So ordered.*